**Delbert Winston JONES, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 41977.**

Court of Criminal Appeals of Texas.

May 7, 1969.

Rehearing Denied July 9, 1969.

---

Cayton, Gresham & Fulbright, by Karl Cayton, Lamesa, for appellant.

Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Judge.

The offense is murder without malice; the punishment, assessed by the jury, five years.

This appeal is from a conviction in Dawson County after a change of venue from Ward County following a reversal of the first conviction. Jones v. State, 416 S.W.2d 412.

The indictment charges the appellant with the murder of Martha Garcia with malice aforethought "by hitting and striking her with an instrument and weapon, the exact kind and character to the Grand Jury unknown."

At the very outset appellant challenges the sufficiency of the evidence to sustain the conviction.

The State's evidence as reflected in this 2,000 page record shows that at approximately 8:30 a.m. on November 19, 1965, T. J. Wheeler, a salesman with the Wheeler Furniture Store in the City of Monahans, went to the nearby apartment of Reyes Garcia to determine why he had not appeared for work. There he observed the apartment door broken open, the glass door pane smashed, and the Yale type door lock broken off and lying inside the apartment. Then he observed the body of the 18 or 19 year old Garcia lying on the floor in blood and Mrs. Garcia lying face up on the bed. When Officer Mendez of the Monahans Police Department arrived at the blood splattered upstairs apartment he determined that Garcia was dead, but that the

nude body of Martha Garcia lying in blood still contained signs of life. However, the 16 going on 17 year old Martha, apparently in the 8th month of her pregnancy, expired enroute to the hospital.

The mortician, Wilson, found an indentation above Martha's left ear in which a finger could be laid where the flesh had not been broken, possibly made by some type of round instrument.

After having described other injuries, Dr. Dawson expressed the opinion, following an autopsy, that Martha Garcia had died from multiple contusions of the brain, a fractured skull and brain hemorrhage. She had not been sexually molested. In Dr. Dawson's opinion the same instrument caused both deaths, though Reyes Garcia had been more severely injured and apparently had died instantly; that the injuries appeared to have been produced by a long slender cylindrical object. Dr. Dawson further related that the condition of Reyes Garcia's body was consistent with death at approximately 4 a.m. on November 19, 1965.

The Garcias had lived in Monahans only one or two months and evidence reflected that both were shy, retiring and polite individuals and that Reyes was a good worker. There were no known difficulties with any other person.

In the late afternoon of November 19, the day the killings were discovered, Sheriff McNerlin and one of his deputies, Herman Hamilton, in the course of a general investigation into an unsolved crime, went to appellant's home in Monahans. Appellant agreed to talk to them and voluntarily accompanied them to the Sheriff's office, the Garcia apartment and was then returned home, all within a period of 30 to 45 minutes. He told the Sheriff that he had been in bed at 1 a.m. that morning and when asked handed to Deputy Hamilton a long sleeved western style shirt which he claimed he had worn the night before.

Later the same night at approximately 9 or 9:30 p.m. Deputies Carr and Keele and District Attorney Archer went to appellant's house and he sat in their car and re-iterated the fact that he had been home by 1 a.m. that morning and had not been north of the T. & P. Railroad tracks in Monahans or near the Garcia apartment the night before. After approximately 20 minutes the officers and the District Attorney left to continue their investigation elsewhere.

Subsequent visits to the appellant's home beginning on the morning of November 20, 1965, turned up what appeared to be a bloodstain on the wash basin in the bathroom and a lug wrench-tire tool in appellant's car which appeared to have a spot of blood on it. After tests, a lab technician, Bledsoe, identified the spots as being blood. It was also determined that there was human blood on appellant's blue jeans, on the white and yellow sheets from his bed and on the molding from the back door of appellant's house. The blood on the molding proved to be type O blood as was Reyes Garcia's blood. Still further, it was shown that there was human blood on both of appellant's shoes consisting of stains and spatters. One spot of blood was described as a droplet which was sufficient to run down and form a crust on the shoe.

Other State's evidence shows that appellant appeared at the Blue Lantern Lounge or Nightclub on November 18, 1965, at approximately 7:30 p.m. and stayed until closing time shortly after midnight. During this time he was drinking whiskey and was in the opinion of the proprietress drunk when he left. The proprietress Cowles, as well as Talmedge Green with whom he left the lounge, and others who were with him shortly thereafter, all testified that at the time in question appellant was not wearing the long sleeved western style shirt given to the Sheriff, but a short sleeved sportshirt and blue jeans which were clean and neat. None of the witnesses observed any cuts or gashes on his arms.

When the lounge closed Green and the appellant went in Green's car to the Sands

Motel Restaurant for coffee and sat with Billy Duckworth and John Dee Richardson who were eating. The foursome was joined by one Jackie Williams. Subsequently Richardson departed alone and at approximately 1:45 or 2 a.m. the remainder of the group left after Green offered to take Jackie Williams to her home. After driving a while and discussing the possibility of a trip to Big Lake so that Jackie could see her boyfriend, she was taken to her apartment where she got out. The evidence showed that she lived on E Street occupying an upstairs apartment with an outside stairway on a building facing south; that the Garcias' apartment, of similar construction, located one block south and one block east, was also an upstairs apartment with an outside stairway on a building facing south; that the appellant wore eye glasses on occasion as a result of a slight defect in one eye, but that he was not wearing glasses at the time in question.

As the appellant, Green and Duckworth drove away from the Williams' apartment the appellant, who had grabbed Jackie Williams' private parts in a cafe several days earlier, asked both men what her address was, stating that he "thought he was going to go back over there to see Jackie," as he "thought that would be pretty good."

After taking appellant to his car parked at the Blue Lantern and taking Duckworth to Richardson's house, Green returned to Jackie Williams' apartment house.

As he arrived he observed appellant drive slowly through an intersection 75 feet away. Green then went up to Jackie Williams' apartment and informed her of what he had seen and remained there for approximately 45 minutes. After leaving Green drove around three or four blocks in every direction from the apartment, but did not again see the appellant.

Appellant was also placed in the area by the testimony of Patrolman Jerry Gossage and Captain Joe Drea of the Monahans Police Department. Gossage identified appellant's car as being parked, about 2:35 a.

m., one block west and two blocks north of the Williams' apartment. He trailed the car, after it left its parking place, for several blocks before abandoning surveillance. At 2:45 a.m. he saw appellant driving south at Alice and C Streets approximately ½ block from the Garcias' apartment.

Captain Drea related he saw appellant driving south on Main and D Streets at 3 a.m. and at about 4 a.m. he saw the same automobile come out of West C Street or the alley between the Continental Emsco Building and Warehouse, which was about ½ block from the Garcia apartment. The Garcias' and Williams' apartments and all the areas where appellant was observed by the officers were north of the Texas & Pacific Railroad tracks in the town of Monahans.

Sandra Jeffers testified that though she and appellant were married to others, they began living together in California prior to moving to Texas. She related that when appellant left home on the evening of November 18, 1965, he was dressed in a short sleeved sportshirt, blue jeans, and was clean and neat and he did not have any cuts or gashes on his arms; that she stayed home to care for two little girls with whom she was baby sitting.

She further revealed that he came home at approximately 2:15 to 2:30 a.m. while she was in bed with one of the little girls but not asleep; that he went to the bathroom and then left the house again; that he returned at approximately 4 a.m. and went to the bathroom where it sounded as if he was washing something; that after this, the appellant came to bed and then awakened her around 5 a.m. and they had sexual intercourse.

Later upon arising the witness Jeffers found that the short sleeved shirt appellant had been wearing the night before had been washed but she was able to observe red specks on the shirt which appeared to be blood. She replaced the shirt behind a box of clothes in the bathroom where she found it.

Sandra Jeffers also related that she saw fresh spots of blood on the bed sheets and testified appellant had a gash or cut on his left elbow which appeared to be fresh and which had not scabbed over.

She testified that the shirt given the Sheriff was not the shirt appellant had worn on the night in question; that appellant had told her he was home by 1 a.m. which she knew was not true and that he requested that she soak his blue jeans as he had gotten blood on them as a result of a fight with another man several days earlier when she was present which she knew was not true; that she was soaking such pants when the officers arrived on November 20 and found them; that she was present when the officers found dark stains and spots on the seat covers of the car and saw what appeared to be blood on the lug wrench-tire tool in question.

Appellant did not testify but called a witness who termed himself a medical technologist. This witness' testimony related to experiments he had conducted with blood samples and was offered in an effort to discount the State's testimony as to the blood spots and stains discovered by the officers.

■ The court charged on the law of circumstantial evidence and we find the evidence sufficient to sustain the jury's verdict when considered in the light most favorable thereto as we are required to do.

The record shows that appellant washed and attempted to hide his shirt, and lied to the officers about the shirt he wore and about being in the neighborhood where the killings occurred. The record also reveals the appellant to be a man of quick and violent temper. In addition to the fight with another man earlier in the week, appellant engaged in a heated discussion and almost came to blows with Duckworth at the Sands Motel Restaurant over Duckworth's red shirt. Also the following day on the occasion of the officers' first visit to his home appellant was not home upon their

arrival as he was off chasing some teenagers who had just passed in an automobile and had supposedly yelled and used some obscene language.

Appellant cites and relies upon Freels v. State, 151 Tex.Cr.R. 589, 210 S.W.2d 582, which is clearly distinguishable from the case at bar on the facts alone. Thomas v. State, 150 Tex.Cr.R. 540, 203 S.W.2d 536, also cited, is distinguishable because in Thomas there was no evidence placing the defendant in close proximity to the scene of the murder nor did the circumstances relied upon by the State there add up to clear and convincing proof of the defendant's guilt.

■ It is not necessary that every fact point independently and directly to the guilt of a defendant. It is enough if the conclusion of guilt is warranted by combined and cumulative force of all incriminating circumstances. Parish v. State, 85 Tex.Cr.R. 75, 209 S.W. 678; Finch v. State, 89 Tex.Cr.R. 363, 232 S.W. 528.

In Taylor v. State, 87 Tex.Cr.R. 330, 221 S.W. 611 at 615 it is stated:

"The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. Shultz v. State, 13 Tex. 401; Hamlin v. State, 39 Tex.Cr.R. [579] 606, 47 S.W. 656; Porch v. State, 50 Tex.Cr.R. 335, 99 S. W. 102."

Appellant's able counsel in their 68 page brief advance and argue a number of possibilities or suppositions they draw from the evidence most of which were also argued to the jury. These are all matters which go the weight to be given the evidence, and in determining the sufficiency

of the evidence it must be viewed in the light most favorable to the jury's verdict.

Ground of error #1 is overruled.

Next, appellant contends that the trial court erred in admitting into evidence appellant's statements made to the District Attorney and certain peace officers on the two occasions such individuals visited his home on the evening of November 19, 1965, as described above. It was on these occasions that appellant stated he had gotten home by 1 a.m., had not been "north of the tracks" and claimed to have been wearing a long sleeved shirt. It is his contention that the same were admitted in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974.

 While Miranda was decided after the conversations here in question, the Supreme Court has held that Miranda is applicable to cases in which the trial commences after June 13, 1966. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. And the State here admitted that no warnings were given the appellant.

As we interpret Miranda's requirement of warnings and waiver, it applies to custodial interrogation though it is not by any means limited to police station house interrogation, Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, and may be applicable to a custodial interrogation at an accused's home when he is under arrest and not free to leave at the time of questioning. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311.

In the case at bar the undisputed evidence shows that appellant voluntarily agreed to talk to the officers and was not under arrest, "in custody" or "otherwise deprived of his freedom of action in any significant way" at the time of his oral statements.

The record reflects that the officers were making a general investigation into an unsolved crime and were checking on all those reported to have been abroad on the night in question. The investigation on November 19 had not begun to focus on the accused.

We decline to apply Miranda to the fact situation here described. Bendaw v. State, Tex.Cr.App., 429 S.W.2d 506; Newhouse v. State, Tex.Cr.App., 420 S.W.2d 729; Robinson v. State, Tex.Cr.App., 441 S.W.2d 855.

Ground of error #2 is overruled.

The judgment is affirmed.

DOUGLAS, J., not participating.