Clifton Charles RUSSELL,
Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 66410.

Court of Criminal Appeals of Texas,
En Banc.

July 6, 1983.
Rehearing Denied Sept. 28, 1983.

Stan Brown, Abilene, for appellant.

Patricia A. Elliott, Dist. Atty. and R. Jack Grant, Asst. Dist. Atty., Abilene, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder. Punishment was assessed at death by the court in accordance with

the jury's affirmative answers to the two special issues submitted pursuant to Article 37.071(b)(1) and (2), V.A.C.C.P.

Appellant advances sixteen grounds of error. This is a circumstantial evidence case. Appellant challenges the sufficiency of the evidence at the guilt stage of the trial, to support the verdict, or to show that the murder was committed in the course of committing robbery. He also challenges the sufficiency of the evidence to support the jury's affirmative findings to special issues one and two at the penalty stage of the trial. In other grounds of error appellant contends the court erred in failing to quash the indictment as it did not name the victim of the robbery, that the court erred in admitting a blood sample taken from him by virtue of a search warrant, that the court erred in admitting an extraneous offense and prejudicial opinion testimony, that the court erred in refusing a special requested charge on "deliberate" at the penalty stage of the trial, and also erred in submitting special issues no. 2 as it is unconstitutionally vague.

We shall initially examine the evidence. The deceased, Hubert Otha Tobey, was an employee of the Federal Aviation Administration at the Abilene Municipal Airport. His working hours on Sunday, December 2, 1979 were from 4 p.m. until midnight. Rodney Tobey, deceased's son, testified his father left home about 3:40 p.m. on that date to go to work. He was wearing a brown suede jacket, dark pants and Dan Post boots. The deceased was driving his wife's 1974 Lincoln Continental Mark IV automobile bearing Texas license plates MXM 997. The car had a defective tail light. He was to fill the automobile with gas after work. His wife's white Levi jacket was in the automobile. Rodney Tobey testified his father owned a pocket knife with two sharp blades and carried a wallet and a money clip.

Joe Boyle, air traffic control specialist with the Federal Aviation Administration, relieved the deceased at the airport on December 2, 1979. He arrived at the airport about 20 minutes to midnight, was briefed by the deceased on operational conditions. According to Boyle the deceased left the F.A.A. facility at approximately 11:45 p.m.

The deceased had been issued three Save a $ club gasoline credit cards, nos. 13,181, 13,182 and 13,183, for use at unmanned self-service gas stations. Insertion of a card would activate the gas pump and then information concerning the transaction would be relayed via telephone wires to a computer which would record the details, including the date, time, place, amount of gasoline purchased and the number of the credit card.

Donald Manley, computer programmer for Western Marketing Company, testified from computer printouts concerning the transactions of December 2, 1979. The printouts reflected that at 11:56 p.m. someone using card no. 13,181 issued to H.O. Tobey inserted the card at a pump at the station on South Seventh and Treadway Streets in Abilene. The system was activated, but no gas was pumped. At 11:59 p.m. the same card was used at the same pump to complete a transaction, reflecting that 20 gallons of gas were pumped.

Abilene police officer, Bernard Kastner, testified that while on patrol at 12:50 a.m. on December 3, 1979 he stopped at the Minute Stop Grocery at East Highway 80 and Washington Boulevard. There he observed a silver or grey Lincoln Continental with Texas license no. MXM 997. Standing on the left side of the car was a white male with curly brown hair. Kastner identified appellant as being of the same height and build of the person he observed by the car. He saw a black male, muscular build and acne facial marks, come out of the store and get into the car. The Continental then proceeded west on Highway 80.

James Miller, Abilene police officer, and his partner, David Gage, stopped at the Minute Stop about 12:50 a.m. on December 3. Miller saw Kastner's vehicle and a silver Continental. One man was in the driver's seat of the Continental and a black male came out of the store in a hurry, get in the car, and it proceeded west on Highway 80. Officer Gage described the driver

of the Continental as a white male. He saw a black male come out of the store at a fast pace and get into the passenger's side of the car.

Both Gage and Miller noticed one of the tail lights on the Continental was not working. Gage stated a photograph of the Tobey Continental looked like the one he saw at the Minute Stop.

Between 9 and 9:30 a.m. on December 3 John Woods went to 526 Thomas Street in Abilene to pick up his stepdaughter's husband for work. Upon arrival, he saw a padlock on the door, and then observed a lot of blood and brain matter. Woods went to get a friend and to call the police.

Abilene police officer, Jay Barbian, responded to the call and went to 526 Thomas Street. Barbian found the partially nude body of the deceased at the location. Investigation uncovered a large piece of concrete with fresh blood on it. A bloody white Levi jacket was found as well as a brown suede jacket.

Dr. Jarrett Williams, a pathologist, conducted the autopsy on the deceased's body. He related Tobey had received a severe blow to his head, crushing his skull, which could have been from the bloody piece of concrete found at the scene. A large portion of the brain was missing. There were numerous knife wounds, one being to the juglar vein, which could have caused death.

Appellant was identified as one of two men entering the Big Tex Pawn Shop in Midland on December 3, 1979 between 9:30 and 10:30 a.m. John Dungan, the operator, also stated appellant was accompanied by a black male. They attempted to pawn a television set. When Dungan requested identification, the black male went to a silver Lincoln or Mercury, and then appellant presented Dungan with a driver's license with the name Tobey or Tomey on it. The license photo did not resemble appellant and appellant gave Dungan a different birth date than that on the driver's license. Dungan refused to accept the television set. When the two men left, Dungan took the license number of the car which he believed to be MXM 997.

Midland police officer, Ronnie Wilson, testified he saw a Lincoln bearing license plate number MXM 997 at the B & B Trading Post in Midland about 10 a.m. on December 3, 1979. Two men, one white, approximately appellant's size, and a black male, were unloading a television set from the car and taking it into the trading post.

Michael Wicker was hitchhiking from Plains, Texas to Hobbs, New Mexico, on the afternoon of December 3, 1979. About 10 miles out of Hobbs he was picked up by a white male and a black male in a silver Lincoln. He identified appellant as the driver and William Battee, Jr., as the black male passenger. Battee told Wicker they got the car from appellant's "old lady," and when Wicker noticed blood in the car Battee explained appellant had been punched in the nose when he had taken the car keys. After arriving in Hobbs, they went to a Mimi Mall to get something to eat. Appellant, who was apparently drunk, and Battee began "grabbing" women in the mall, causing a disturbance. Wicker paid for their food and left. Appellant and Battee followed. Officers were near the Continental and all three men were arrested.

Hobbs police officer, Richard Baum, testified at approximately 2 p.m. on December 3 he went to the Mimi Mall and saw an illegally parked Lincoln Continental bearing Texas license MXM 997. Upon hearing yelling and cursing, he saw a black male and two white males. The black male was cursing and Baum arrested Battee, who gave his name as Willie Green. The two white males, identified as appellant and Wicker, crossed the street to calm Battee, but denied knowing him. Battee told officer Baum he was hitchhiking and had been picked up by appellant and Wicker. Appellant replied Battee had picked "them" up. Appellant gave his name, but it was different than the name he gave another officer. All three men were arrested with appellant being taken into custody for being intoxicated.

Baum learned the Continental was registered to the deceased. After a phone con-

versation with Sgt. Casey Bradshaw of the Abilene Police Department, Baum removed Battee's blood splattered tennis shoes. He removed appellant's pants, underwear, shirt and shoes. All items save the shoes had what appeared to be fresh blood on them. There were no marks or lacerations on appellant's body.

Sgt. James Murphy of the Hobbs Police Department locked and sealed the doors of the Lincoln Continental at a Hobbs garage on December 3, 1979. Inside the car he saw blood spots.

On December 3, Sgt. Casey Bradshaw of the Abilene Police Department talked with Officer Baum over the phone and later Bradshaw secured arrest warrants for appellant and Battee. In Hobbs the next day he inspected the Continental and found the deceased's F.A.A. identification card, the deceased's bank club card and a Save a $ credit card number 013181. He removed certain blood stained parts of the right front door and took blood scrapings from other parts of the car. He received items of clothing from the Hobbs police that had been taken from appellant and Battee.

The deceased's Dan Post boots were found in a Midland cemetery.

Sarah Williams, forensic serologist, compared blood samples of the deceased with known blood samples from the appellant and Battee, as well as with blood samples removed from the Continental and from the clothing of appellant and Battee. As a result of various tests and comparisons, Williams was able to determine the blood on appellant's clothing was not his nor that of Battee. The blood was compatible with that of the deceased. While appellant, Battee and the deceased all had blood type O, there were differences in the enzyme structure. Williams related that only .005% of the population had blood exactly like that of the deceased.

A footprint found at the Abilene gas station where the credit card was used matched a footprint found at 526 Thomas Street where the body was discovered, and matched the tennis shoes worn by Battee when arrested.

The State also called Jose Gonzales, who testified he came to Abilene on November 24, 1979, prior to the instant case. Near midnight he met appellant and Battee in a club. About an hour later the three left in Gonzales' pickup truck, supposedly to look for women. Once out in the country, appellant and Battee began beating Gonzales. They took his clothes, his watch and wallet containing $140.00. They drove off in the pickup after telling Gonzales to run.

The appellant offered no evidence at the guilt stage of the trial.

■ Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction, LeDuc v. State, 593 S.W.2d 678 (Tex.Cr.App.1979); Earnhart v. State, 575 S.W.2d 551, 554 (Tex.Cr.App.1979); Flores v. State, 551 S.W.2d 364 (Tex.Cr.App.1977); Carlisle v. State, 549 S.W.2d 698 (Tex.Cr.App.1977); Indo v. State, 502 S.W.2d 166 (Tex.Cr.App.1973), and viewed in the light most favorable to the State. Ysasaga v. State, 444 S.W.2d 305, 308 (Tex.Cr.App.1969).

■ And it is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances proven do not exclude every other reasonable hypothesis except that of the guilt of the accused; and proof amounting only to a strong suspicion or mere probability is insufficient. Flores v. State, supra; Earnhart v. State, supra; Stogsdill v. State, 552 S.W.2d 481 (Tex.Cr.App.1977); Culmore v. State, 447 S.W.2d 915 (Tex.Cr.App.1969).

In Moore v. State, 532 S.W.2d 333 (Tex.Cr.App.1976), it was written:

"Ordinarily, the test on appeal is whether there was evidence from which the jurors (advised of the restrictions the law places upon them in condemning one on circumstantial evidence)[1] might rea-

1. This was at least true until the time of the majority opinion in Hankins v. State, 646

S.W.2d 191 (Tex.Cr.App.1983).

sonably conclude that every reasonable hypothesis other than guilt was excluded. *Ysasaga v. State*, supra (444 S.W.2d 305)."

It has also been stated in 24 Tex.Jur.2d, Evidence, § 742, p. 424:

"In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent. The court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged." *Ysasaga v. State*, supra; *Flores v. State*, supra; *Nathan v. State*, 611 S.W.2d 69 (Tex.Cr. App.1981).

In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State*, supra; *Mills v. State*, 508 S.W.2d 823 (Tex.Cr.App. 1974); *Herndon v. State*, 543 S.W.2d 109 (Tex.Cr.App.1976). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Jones v. State*, 442 S.W.2d 698 (Tex.Cr.App.1969); *Taylor v. State*, 87 Tex.Cr.R. 330, 221 S.W. 611, 615 (Tex.Cr.App.1920); *Flores v. State*, supra; *Nathan v. State*, supra at p. 75.

The record shows that the deceased left home for work on December 2, 1979 in his wife's Continental automobile wearing Dan Post boots, with wallet and money clip. He was last seen alive leaving work about 11:45 p.m. His body was found the next morning about 9:30 a.m. at 526 Thomas Street, brutally beaten, one-third of his brain missing. His trousers were found on top of a shed with the pockets turned inside out. The Continental, boots, money, etc., were missing.

About an hour after the deceased left work a man meeting appellant's description was seen in the deceased's car, along with a black male companion at the Minute Shop in Abilene. About the time the body was discovered appellant was identified as being in Midland trying to pawn a television set using the deceased's identification. He was with a black male and was seen in the deceased's car. The deceased's boots were found in Midland. Other evidence placed the appellant in New Mexico driving the deceased's car. He was with William Battee, a black male. When arrested, he first gave a different name. There was blood in the car and on his clothes. The blood on his clothes was shown not to be his or Battee's and was shown to be compatible with that of the deceased.

The evidence was sufficient to show a murder committed in the course of a robbery (V.T.C.A., Penal Code, § 29.02) as alleged. Appellant's sufficiency of evidence (at the guilt stage) contentions are overruled.

Appellant also contends the trial court "erred in failing to quash the indictment as to count one therein for the reason that same fails to provide adequate notice in that said count fails to name the victim of the robbery appellant was allegedly in the course of committing."

The conviction in the case was upon count one of the indictment drafted pursuant to V.T.C.A., Penal Code, § 19.03(a)(2), which in pertinent part alleged the appellant:

"... did then and there unlawfully, intentionally and knowingly cause the death of an individual, Hubert Otha Tobey, by beating and hitting him with a piece of concrete and by cutting and stabbing him with a knife; and the said Clifton Charles Russell a/k/a Clifton

Charles Lacy did then and there intentionally cause the death of the said Hubert Otha Tobey in the course of committing the offense of robbery."

An examination of appellant's motion to quash reflects it was directed to a claim of duplicitous pleading in that two means of causing death were alleged and that it failed to put the appellant on proper notice as to the manner of death. There was no claim therein of failure to name the victim of the robbery.

Appellant raises this ground for the first time on appeal since it was not contained in his motion to quash. Appellant relied upon *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr. App.1980), and *King v. State*, 594 S.W.2d 425 (Tex.Cr.App.1980). See also *Silguero v. State*, 608 S.W.2d 619 (Tex.Cr.App.1980); *Evans v. State*, 601 S.W.2d 943 (Tex.Cr. App.1980).

█ The instant case can be distinguished from the above cases. In the instant case, unlike the cases above, no motion to quash was made upon the basis that the indictment failed to allege the victim of the underlying offense. Absent an attempt to draw the trial court's attention specifically to the failure to name the victim of the underlying transaction, nothing is presented for review. *Kipperman v. State*, 626 S.W.2d 507, 512 (Tex.Cr.App. 1981); *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983).

█ A jurisdictional defect in an indictment is a defect which renders the indictment insufficient in that it fails to allege the constituent elements of the offense. *Terry v. State*, 517 S.W.2d 554 (Tex.Cr. App.1975); *Brem v. State*, 571 S.W.2d 314 (Tex.Cr.App.1978). The instant indictment does not suffer such defect. There is no fundamental error.

In two grounds of error appellant complains of the admission of testimony concerning a blood sample taken from him because it was obtained by virtue of an invalid search warrant, and argues if the warrant was facially valid then the procedure authorized by Article 18.02(10), V.A.C.

C.P., as applied to him was an unreasonable legislative classification denying him equal protection of the law.

It is his initial argument that Article 18.02(10), supra, does not list blood as one of the grounds for the issuance of a search warrant, and that a search warrant issued for that reason was invalid. The appellant filed a motion to quash the warrant. In said motion he asked in the alternative for a motion to suppress the results in the event it was too late to prevent the taking of his blood. The motion was overruled. Whether there was a hearing does not appear from the record. The search warrant, if any, is not in the record. There is no transcription of the court reporter's notes, if any, to be transcribed. We are unable to appraise the action of the trial court or to determine if appellant ever urged his motion to suppress.

Sgt. Bradshaw testified on January 29, 1980, he executed a search warrant on appellant and blood was taken. There was no objection to this testimony nor to the latter testimony of the forensic serologist as to her tests concerning such blood sample.

If it can be argued that appellant has preserved his contention for review, it is observed that this court has recently held that blood is an item for which a search warrant may issue under Article 18.02(10), V.A.C.C.P., as amended 1977. See *Gentry v. State*, 640 S.W.2d 899 (Tex.Cr.App.1982) (Opinion on Discretionary Review Without Petition).

Appellant's other argument as to the denial of the equal protection of the law is based on the fact that Article 18.01(e), V.A. C.C.P., prohibits the issuance of a search warrant under Article 18.02(10), supra, if the property or items are located in an office of a newspaper, news magazine, television station or radio station.

█ There was no objection on this basis in the trial court. Failure to object can even waive an error involving constitutional rights. *Mendoza v. State*, 552 S.W.2d 444 (Tex.Cr.App.1977); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978).

See also *Watkins v. State,* 572 S.W.2d 339 (Tex.Cr.App.1978); *Shannon v. State,* 567 S.W.2d 510 (Tex.Cr.App.1978). Even if appellant had properly objected, his contention would still be without merit. In order to successfully claim denial of equal protection of the law on the basis of unreasonable classification, an accused must prove the existence of a class of which he is a part and unreasonable discrimination. See *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). This appellant has failed to do.

Next, appellant urges the court erred, over objection, in admitting evidence obtained by an illegal warrantless search of his person. Hobbs Officer Baum testified that about 30 minutes after appellant was arrested, and after talking with Sgt. Bradshaw in Abilene, he took appellant's trousers from him in the jail cell without a warrant therefor. There was no objection to this testimony. During the testimony of the forensic serologist when the trousers were offered, the only objection was that it was "a warrantless search." The objection was overruled. It is questionable whether the contention is preserved for review in light of the general objection.

■ Further, we conclude the clothing was admissible under *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). Still further, it is observed that Baum and later Bradshaw testified as to the clothing and its condition without objection prior to the forensic serologist's testimony. It would appear the failure to timely object waived any right to complain on appeal. *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978); *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978); *Von Byrd v. State,* 569 S.W.2d 883 (Tex.Cr. App.1978). See also *Boulware v. State,* 542 S.W.2d 677 (Tex.Cr.App.1976); *Shumake v. State,* 502 S.W.2d 758 (Tex.Cr. App.1973).

Appellant additionally contends the trial court committed error in admitting evidence of the prior extraneous robbery of Jose Gonzales on November 25, 1979.

■ This was a circumstantial evidence case. There was no direct evidence placing appellant at the scene of the murder. Extraneous offenses are admissible on the question of identity if the extraneous offense has sufficient common distinguishing characteristics to show that it was the handiwork of the accused, and the State's case is entirely circumstantial on the question of identity. *Hinkle v. State,* 442 S.W.2d 728 (Tex.Cr.App.1969); *Jones v. State,* 568 S.W.2d 847 (Tex.Cr.App.1978).

■ Gonzales was robbed by appellant and Battee, a white male and a black male. It appears that the deceased Tobey was robbed by two men, one white, one black. Both robberies occurred near midnight, both involved a male victim who was alone, both victims were undressed or partially undressed. In each case a motor vehicle was taken. The robberies took place nine days apart in Abilene. There were sufficient common distinguishing characteristics or similarities to justify the admission of the extraneous offenses. See *Ransom v. State,* 503 S.W.2d 810 (Tex.Cr.App.1974). *Hinkle v. State,* supra.

Appellant's contention is overruled.

In five grounds of error appellant complains the court erred in admitting prejudicial opinion testimony "amounting to a conclusion of law." Reference is made to the testimony of Abilene police officers Melvin Martin, John Perry and Casey Bradshaw and Otis Wiley, investigator with the district attorney, as well as Robert Lee Boone, a convicted felon. All of these witnesses were permitted to testify as to the probability of appellant being violent in the future. The objection to their testimony was that they were not qualified to state their conclusion or opinion. The officers had all known appellant for several years, some having handled him as a juvenile. Boone was a Taylor County jail inmate when appellant had been incarcerated there. Appellant had beaten him because he had mumbled in his sleep. Based on this experience and his prior experience in the penitentiary, he expressed opinion appellant would be violent in the future.

The trial objection to each witness' testimony went to the weight to be given and not the admissibility of the testimony. On appeal appellant argues the witnesses were permitted to state a conclusion of law. The ground of error does not comport with the trial objection, and nothing is presented for review. *Carrillo v. State*, 591 S.W.2d 876 (Tex.Cr.App.1979); *Cain v. State*, 549 S.W.2d 707 (Tex.Cr.App.1977).

Further, we have previously held that a properly qualified lay witness could state an opinion concerning the probability that a capital murder defendant would continue to commit criminal acts of violence. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr. App.1980); *Simmons v. State*, 594 S.W.2d 760 (Tex.Cr.App.1980). Each of the witnesses here involved knew the appellant and were in a position to express the opinions they did.

Further, Article 37.071(a), V.A.C.C.P., provides in part:

"... In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence ...."

Appellant's contentions are overruled.

Appellant complains the court failed to respond to his objection to the inclusion of Special Issue No. 2 in the charge on punishment since the provision relating to said special issue is unconstitutionally vague. The contention is overruled. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Collins v. State*, 548 S.W.2d 368 (Tex.Cr.App.1976); *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980). See also *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976).

No error is shown.

Still further, appellant contends the court "erred in failing to respond to appellant's timely requested charge, and instruction to the jury at the punishment phase defining 'deliberate.'" Reference is made to Special Issue No. 1.

Article 37.071(b), V.A.C.C.P., provides in part:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed *deliberately* and with the reasonable expectation that the death of the deceased or another would result; ...." (Emphasis supplied.)

The court submitted the following charge:

"Special Issue No. 1

"Was the conduct of the defendant, Clifton Charles Russell, Jr., that caused the death of the deceased, Hubert Otha Tobey, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"

Appellant's special requested charge was as follows:

"Now comes Clifton Charles Russell, Defendant in the above-styled and numbered cause, by and through his attorneys of record, and requests that the following be included in the Court's charge to the jury herein:

"I.

"The word 'deliberate' means formed or arrived at or determined upon a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of Defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is then deliberate.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with

different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and a decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as deliberate murder. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decided to and does kill.

"WHEREFORE, Defendant prays that the above requested charge be made a part of the Court's charge to the jury herein."

This was the special requested charge which was denied by the trial court.

The words "deliberate" or "deliberately" are not statutorily defined in the Code of Criminal Procedure or Penal Code.

█ It is not error, in a prosecution for violating a statute, to refuse to define a word used in the statute, when such word is used in its ordinary sense, and it is easily comprehended by everyone. *Humphreys v. State*, 34 Tex.Cr.R. 434, 30 S.W. 1066 (Tex.Cr.App.1895).

█ Where there is no statutory definition of a term, the question of trial court's obligation to define the term depends on whether the term has such a common and ordinary meaning that jurors can be fairly presumed to know and apply such meaning. *Phillips v. State*, 597 S.W.2d 929 (Tex.Cr. App.1980).

█ Where terms used are words simple in themselves and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms, and under such circumstances such common words are not necessarily to be defined in the charge to the jury. *Hogan v. State*, 496 S.W.2d 594 (Tex.Cr.App.1973), cert. den. 414 U.S. 862, 94 S.Ct. 81, 38 L.Ed.2d 112; *Joubert v. State*, 136 Tex.

Cr.R. 219, 124 S.W.2d 368 (Tex.Cr.App. 1938).

In *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977), this court held the trial court need not define "deliberately" as used in Article 37.071, supra, in its charge at the penalty stage of a capital murder trial. See also *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980); *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981).

Further, the appellant has made no showing that he was entitled to the special requested charge set out above, and upon which he relies.

In *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App.1976), this court wrote:

"The statutory requirements that appellant's conduct be committed *deliberately* does not mean that it must be a *premeditated* act."

In *Fearance v. State*, 620 S.W.2d 577, 584 (Tex.Cr.App.1980), this court wrote:

"On the other hand, resort to other determinations of evidentiary sufficiency for special issue one is instructive for we know that 'deliberately,' as used in that question of the charge on punishment, is not the linguistic equivalent of 'intentionally,' as used in the charge on guilt-innocence, *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981); rather, it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct."

Footnote # 6 of *Fearance* reiterates that "deliberately" need not be "premeditated."

█ Under these authorities the requested charge would not have been proper.

We do not understand that appellant contends that this court should now devise a definition of "deliberately," set it forth, and reverse the conviction for the failure of the trial judge to have the foresight not to give the same definition in his instructions to the jury.

Appellant's ground of error is overruled.

■ Appellant also challenges the sufficiency of the evidence to support the jury's affirmative answer to special issue number one. That issue as submitted under Article 37.071(b)(1), V.A.C.C.P., has already been set out. Taking into consideration the evidence at both stages of the trial, we conclude, without reiterating the testimony, that it was sufficient to support the jury's "yes" answer to special issue number one. See *Granviel v. State*, 552 S.W.2d 107, 122–123 (Tex.Cr.App.1976).

Appellant makes claim that the evidence is insufficient to support the affirmative finding at the penalty stage of the trial as to Special Issue No. 2 as to the probability of future criminal acts of violence.

■ It is well established that the circumstances of the offense itself can sustain an affirmative answer to the second special issue under Article 37.071, supra, if they are severe enough. *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983); *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982); *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979); *Muniz v. State*, 573 S.W.2d 792, 795 (Tex.Cr.App.1978). The jury, at the penalty stage of the trial, may consider all of the evidence adduced at the guilt stage of the trial. *Russell v. State*, 598 S.W.2d 238, 254 (Tex.Cr.App.1980); *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976). Indeed, the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue submitted at the penalty stage of a capital murder case. *Duffy v. State*, supra, and cases there cited; *Crawford v. State*, 617 S.W.2d 925, 933 (Tex.Cr.App.1980).

■ The facts in the instant case reveal a brutal murder committed during the course of a robbery. In addition to numerous knife wounds to the body, including one to the jugular vein, the deceased's skull was crushed by a piece of concrete. The deceased's money and automobile were taken. Jose Gonzales, nine days earlier, had also been attacked and beaten, and his truck taken. There was also testimony that after being confined in the Taylor County jail appellant beat another inmate. There was testimony from several witnesses that appellant's general reputation for being a peaceful and law-abiding citizen was bad, and that in their opinion he would continue to commit acts of violence in the future.

There was no psychiatric testimony, but it is not essential to support an affirmative finding to the special issue in a capital murder case. *Brooks v. State*, supra; *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977).

When the facts of the instant offense are considered with the additional evidence of the extraneous robbery, the beating in jail and appellant's reputation, we conclude the evidence is clearly sufficient to support the jury's finding of "yes" to the second special issue. See *Mitchell v. State*, supra; *Earvin v. State*, 582 S.W.2d 794 (Tex.Cr.App.1979); cert. den. 444 U.S. 985, 100 S.Ct. 492, 62 L.Ed.2d 414; *Brooks v. State*, supra.

Appellant's contention is overruled.

The judgment is affirmed.

CLINTON, Judge, dissenting.

This automatic appeal[1] results from a conviction for the offense of capital murder pursuant to V.T.C.A. Penal Code, § 19.-03(a)(2).[2] Upon the jury's return of affirm-

---

1. See Article 37.071(f), V.A.C.C.P.

2. Section 19.03, supra, provides in germane part:
   "(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:
   
   \* \* \* \* \* \*
   
   (2) the person commits the murder in the course of committing or attempting to commit ... robbery ...;

ative findings to two special issues submitted at the punishment phase, Article 37.071(b), V.A.C.C.P., appellant's punishment was assessed at death. Article 37.071(e), supra.

Complaint is made of the failure of the trial court to instruct the jury at the punishment phase as to the definition of "deliberately" as that term is employed in the first special issue.[3] Appellant presented a written instruction in this regard and requested its submission to the jury, but the charge was refused by the trial court. Article 36.15, V.A.C.C.P.

Appellant now contends that a definition of "deliberate" was essential to assist the jury in making a rational inquiry as to the first special issue. More specifically, he argues "that the deliberateness inquiry of special issue number 1 must logically focus on something other than ... whether the killing was intentional, which question was answered by the jury prior to the punishment phase," and assails, among others, this Court's opinion in *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1976), as having "failed to properly distinguish between the requirement of an intentional killing at the guilt-innocence phase and the deliberateness inquiry of special issue number 1."

This attack on *King* is misplaced. The holding of *King*—that the trial court need

\* \* \* \* \* \*

not provide special definitions for several terms contained in Article 37.071(b)[4]—was bottomed upon the recognition that: the words had not been specially defined by the Legislature; jurors are supposed to know the common meaning of terms, simple in themselves; and the Supreme Court of the United States, in determining our special issues adequately guide the capital jury's deliberations on the matter of punishment, did not require special definitions of the terms in question. The reasoning of *King* is sound and I would adhere to it today.

Appellant's contention and supporting arguments, however, do raise a fair question as to whether developments within the last six years—matters not necessarily available to the Court or contemplated at the writing of *King*—have modified some or all of the underpinnings (as opposed to reasoning) of that decision as regards the term *"deliberately."* Illustrative is appellant's suggestion that "deliberately," though a simple word of and by itself, has now taken on a "technical" meaning;[5] that the "common" word has become "uncommon" in the context of our capital murder procedure.

Therefore, it is appropriate to first consider whether the word "deliberately" has taken on in any material fashion a "special definition."[6]

---

**3.** Article 37.071, V.A.C.C.P. provides in pertinent part:
   "(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment.
   \* \* \* \* \* \*
   (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
   (1) whether the conduct of the defendant that caused the death of the deceased was committed *deliberately* and with the reasonable expectation that the death of the deceased or another would result; \* \* \* \*"
   (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

**4.** These terms are: "deliberately;" "probability;" "criminal acts of violence;" "continuing threat to society."

**5.** Indeed, this Court has held that "deliberately" is something distinct from *"intentionally."* *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981).

**6.** Article 3.01, V.A.C.C.P. provides that,
   "All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where *specially defined.*"
   In a related context, the Code of Construction Act, Article 5429b–2, V.A.C.S., several sections of which apply to our penal code, V.T.C.A. Penal Code, § 1.05(b), provides in part:
   "Words and phrases shall be read *in context* and construed according to the rules of grammar and common usage. Words and phrases that *have acquired a technical or particular meaning,* whether by legislative definition *or otherwise,* shall be construed accordingly."
   Section 2.01, *id.*

Obviously, in view of the fact that "deliberately" was not defined by the Legislature, the focus of the Court's analysis began on what it is *not.* In *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976) the Court, in reviewing the sufficiency of the evidence to support the special issue findings in general, made clear by implication that the fact a defendant is not the "triggerman" in the murder is not of and by itself dispositive of the first special issue. Though guilty of the offense of capital murder only through application of the law of parties,[7] Smith's individual conduct which "aided" and "encouraged" another in the commission of the murder was correctly held to support the jury's finding on the first special issue: Smith was the first to attempt to shoot the victim, and when his weapon misfired, he called to his confederate, "Get him." In *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976), rejecting a contention that the affirmative answer to special issue number 1 was insufficiently supported by evidence because it did not show that the killing was "premeditated," this Court held, "The statutory requirement that a killer's conduct be committed *deliberately* does not mean that it must be a *premeditated* act." [Emphasis original]

Meanwhile, the battle raged over whether "intentionally" and "deliberately" were the same or different, and if different, in what way. A great deal of confusion between the two words, their meanings and import in the Texas capital murder scheme was clearly extant among lawyers and judges, as well as legal scholars,[8] since before the Supreme Court approved the facial constitutionality of that scheme and its application by the Texas courts in *Jurek*

*v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975). *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Moreover, virtually every member of this Court has at one time or another confronted a record of capital voir dire examination in which either the trial judge or prosecutor informs a veniremember that "deliberately" means the same thing as "intentionally." And though it was held by implication that the words are not equivalents early on,[9] the controversy ultimately necessitated this Court's recent decision in *Heckert v. State,* 612 S.W.2d 549 (Tex.Cr.App.1981).

In *Heckert,* supra, after the jury found the defendant guilty of intentionally causing the death of his victim while in the course of burglary, that same jury returned a negative finding on the first punishment issue. Contending on appeal that "deliberately" and "intentionally" are "linguistic equivalents," Heckert argued that the jury's verdicts on guilt and punishment could not be reconciled and presented a fatal variance requiring reversal. In rejecting Heckert's contention, we held:

"If this Court were to adopt appellant's argument that deliberately and intentionally or knowingly were linguistic equivalents, *it would render Art.* 37.071(b)(1), supra, *a nullity.* Under such a holding [the deliberateness question] would be a useless thing in that a finding of an intentional or knowing murder would be irreconcilable with a finding that the defendant's conduct was not committed deliberately. We will presume that *the Legislature would not have enacted Art. 37.071(b)(1),* supra, *had it intended for a finding of deliberateness to be*

---

7. Now V.T.C.A. Penal Code, §§ 7.01 and 7.02. At the time Smith committed the offense, the law of "principals" was contained in Vernon's Ann.P.C. Articles 65, 66, 68 and 69.

8. E.g., Practice Commentary following V.T.C.A. Penal Code, § 19.03; oral argument on the constitutionality of Texas death penalty procedure in *Jurek v. Texas,* infra, 19 CrL 4007 (1976); *Blansett v. State,* 556 S.W.2d 322, 327 n. 6 (Tex. Cr.App.1977); Black, *Due Process for Death: Jurek v. Texas and Companion Cases,* 26 Cath.U.L. Rev. 1, 3 (1977); Crump, *Capital Murder: The*

*Issues in Texas,* 14 Hous.L.Rev. 551, 555 (1977); Goldstein, "Objections to the Court's Charge on Punishment;" "Objection No. 16" at G–191 (printed in Capital Murder Defense Course Materials prepared for the Criminal Defense Lawyer's Project, December 1978); and *Wilder v. State,* 583 S.W.2d 349 (Tex.Cr.App.1979).

9. E.g., *Ex parte Sierra,* 514 S.W.2d 760 (Tex.Cr. App.1974); *Brown v. State,* 554 S.W.2d 677 (Tex. Cr.App.1977).

*based upon the same standard as that of intentional* or knowing."

612 S.W.2d at 550, 551. But see *Blansett v. State*, 556 S.W.2d 322, 327, n. 6 (Tex.Cr. App.1977).

If, as *King*, supra, instructs, we are to take the common meaning of a simple word in its ordinary usage, any handy dictionary will confirm that "deliberately" means just that—a manner of doing an act that is "characterized by or resulting from careful and thorough consideration," "characterized by awareness of the consequences; willful," "slow, unhurried, and steady as though allowing time for a decision." Webster's New Collegiate Dictionary, G. & C. Merriam Co. (1977).[10] That definition has not varied from the one approved by this Court more than eighty years ago in *Ferguson v. State*, 36 Tex.Cr.R. 60, 35 S.W. 369, 370 (Tex.Cr.App.1896):

" 'Deliberately' means 'with careful consideration or deliberation; with full intent; not hastily or carelessly,—as a deliberately formed purpose.' "

This definition was in turn reiterated with approval sixty five years ago in *Welch v. State*, 71 Tex.Cr.R. 17, 157 S.W. 946 (Tex.Cr.App.1913).

Most recently, in *Fearance v. State*, 620 S.W.2d 577, 584 and 584 n. 6 (Tex.Cr.App. 1981) (Opinion on appellant's motion for rehearing), we characterized "deliberately" as "the thought process which embraces more than a will to engage in conduct and activates the intentional conduct," and described "the person who engages in certain conduct deliberately" as one who "has upon consideration said to himself, 'Let's do it.' "

I would adhere to the *Granviel* holding and continue to say that conduct committed "deliberately" need not be "premeditated," for deliberation is but an element of pre-

meditation. As explained in Black's Law Dictionary (4th rev. ed. 1968) at 1343:

"Premeditation differs essentially from *will*, which constitutes the crime; because it supposes, besides an *actual will*, a *deliberation, and* a continued *persistence*." [Emphasis original]

See also *Fearance* at 584, n. 6.

Similarly, I would adhere to the rejection by *Granviel*, supra, of the notion that a killing committed in a purported "frenzy" cannot be effected deliberately and with the reasonable expectation that death would result. See also *Fearance*, supra; *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr. App.1978).

In short, I believe that the first premise underlying the conclusion in *King*, is still viable today: "deliberately" is a word simple in itself and as used in Article 37.-071(b)(1), is to be understood in its ordinary meaning. It has taken on a technical or special definition only in the sense enunciated in *Heckert*, supra: "deliberately" is neither the linguistic nor connotative equivalent of "intentionally." And as *Heckert* acknowledges, this distinction is crucial, for a failure to regard it would render the first special issue a nullity.

But *King* also teaches that words which are used in their ordinary sense are "not *necessarily* to be defined in the charge to the jury," because "jurors are supposed to know such common meaning and terms," citing *Joubert v. State*, 136 Tex.Cr.R. 219, 124 S.W.2d 368 (Tex.Cr.App.1939). It is accordingly necessary to consider whether there exists at this point in the evolution of our capital murder law, any compelling reason to require that "deliberately" be defined in its ordinary sense, in the court's instructions to the jury at punishment, should such a definition be requested.

---

**10.** Webster's New Word Dictionary, McMillan Students Ed., the McMillan Company, New York (1969) defines the adjective "deliberate" as "carefully thought out or formed; done on purpose," or "careful in considering; not rash or hasty," or "slow; unhurried."

It also discloses the word "deliberate" made its first appearance in Old English, having been borrowed from the Latin word "deliberatus," the past participle of the irregular infinitive "deliberare," meaning "to weigh in mind, ponder," which in turn is derived from de + libra, meaning "scale."

This was the basic thrust of the charge requested by appellant in the instant case. See majority opinion at 779.

Before reaching the questions of whether Georgia, Florida, Texas, North Carolina and Louisiana had enacted constitutional procedures for imposition of the death penalty, the Supreme Court of the United States was obliged to first determine whether the "punishment of death *always, regardless of the enormity of the offense or the procedure followed in imposing the sentence, is cruel and unusual in violation of the Constitution,*" an issue previously presented to the Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), but not at that time resolved. *Gregg v. Georgia,* 428 U.S. 153, 168–169, 96 S.Ct. 2909, 2922–2923, 49 L.Ed.2d 859 (1976). In rejecting *Gregg's* contention in this regard, the Supreme Court considered, among other things, whether death is a punishment disproportionate to the crime:

"There is no question that death as a punishment is unique in its severity and irrevocability. When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. But we are concerned here only with the imposition of capital punishment for the crime of murder, and *when a life has been taken deliberately by the offender,* we cannot say that the punishment is invariably disproportionate to the crime. *It is an extreme sanction, suitable to the most extreme of crimes.* [citations omitted]."

*Gregg v. Georgia,* supra, at 187, 96 S.Ct. at 2931.[11] Having determined that death is a suitable punishment in deliberate killings, the Supreme Court observed that *Furman* mandates that where discretion is afforded a sentencing body, that discretion must be "directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* supra, at 189, 96 S.Ct. at 2932. In addition to a *fair procedure,* the Constitution requires "*accurate sentencing information*[12] [as] an indispensible prerequisite to a reasoned determination of whether a defendant shall live or die..." *Gregg,* supra, at 190, 96 S.Ct. at 2933.

After praising the procedure of bifurcating the issues of guilt and punishment, the Court concluded:

"But the provision of relevant information under fair procedural rules is not alone sufficient to *guarantee that the information will be properly used ... by a jury,* [the members of which are] unlikely to be skilled in dealing with the information they are given."

*Gregg,* supra, at 192, 96 S.Ct. at 2934. Conceding that the problem of appropriate use of relevant information by juries "may not be totally correctible," the Court noted that "[i]t seems clear ... that the problem will be alleviated if the jury is *given guidance*[13] regarding the factors about *the crime* and *the defendant....*" *Id.*

Having determined the requisites of constitutional imposition of the death penalty, the Supreme Court proceeded to measure several state statutes against those requisites. In both *Gregg,* supra, and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49

---

**11.** Judgment of the Court announced by opinion of Justice Stewart, joined by Justices Powell and Stevens [hereinafter "the Supreme Court" consistent with all other decisions of this Court since July 2, 1976].

**12.** The exercise of informed sentencing discretion, according to the Court in *Gregg,* requires taking into account: (1) the circumstances of the offense; (2) the character; and, (3) the propensity of the offender. See also *Lockett v. Ohio,* 438 U.S. 621, 98 S.Ct. 2981, 57 L.Ed.2d 1000 (1978), [holding "individualized sentencing" is constitutionally required in capital cases].

**13.** Particularly relevant to the issue before us today is the following rationale:

"The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition. Juries are invariably given *careful instructions on the law and how to apply it* before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law.... When erroneous instructions are given, retrial is often required. *It is quite simply a hallmark of our legal system that juries be carefully and adequately guided* in their deliberations."

*Gregg,* supra, at 193, 96 S.Ct. at 2934.

L.Ed.2d 913 (1976), the Court rejected "vagueness and overbreadth" attacks on the Georgia and Florida statutory "aggravating circumstances," repeatedly referencing the manner in which the State Supreme Courts had construed provisions up to that point,[14] and declining to presume they would adopt "open-ended constructions" in the future.

Viewing the Texas proscriptions of the offense, capital murder, themselves as serving the same purpose as the aggravating circumstances codified by Georgia and Florida law, the Supreme Court in *Jurek*, supra, saw the constitutionality of the Texas procedure dependent on whether the special issues embodied in Article 37.071(b), supra, "allow consideration of *particularized mitigating factors*." [15] *Jurek*, supra, 428 U.S. at 272, 96 S.Ct. at 2956. The Court concluded:

> "It thus appears that, as in Georgia and Florida, the Texas capital sentencing procedure guides and focuses the jury's *objective consideration* of the particularized circumstances of the *individual offense* and the *individual offender....*"

*Jurek*, supra, at 273–274, 96 S.Ct. at 2957.

The Supreme Court made clear its understanding of the role of the second special issue,[16] as construed by this Court, to be a focus on the "particular circumstances" of the "individual *offender*," his character and propensities. The other prong of the con-

stitutionally mandated sentencing inquiry —"objective consideration of the particularized circumstances of the individual *offense*"—seems particularly well met by our first and third special statutory issues.[17] Unlike the second special issue, the first and third focus the jury's attention upon historical facts surrounding commission of *the offense*. The first special issue, unlike the third, is submitted in all capital cases in which the accused is found guilty; it could be labeled a "mitigating factor" since a negative jury finding thereon automatically operates to "mitigate" the punishment to life. Conversely, the focus of the "deliberateness" inquiry might be better characterized an "aggravating circumstance" because an affirmative finding on it is a prerequisite to imposition of a sentence of death.

Apparent, then, is the crucial function of the "deliberateness question" in the Texas capital murder scheme: potentially the difference between life imprisonment and death. It follows that the jury's consideration of this question must be focused on the individual conduct of the defendant in the capital murder transaction and that the jury comprehend its meaning as distinct from other inquiries in the case. As the Supreme Court reiterated, *Furman's* "basic requirement" is to "replace[ ] arbitrary ... jury discretion with *objective* standards to guide, regularize, and make *rationally reviewable* the process for imposing a sen-

14. In *Gregg*, supra, the Court pointed to the Georgia Supreme Court's striking one of the statutory aggravating circumstances for failure to provide "clear and objective standards," and that Court's demonstration of "a concern that the new sentencing procedures provide guidance to juries."

   Similarly, in *Proffitt*, supra, the Court observed that under Florida Supreme Court decisions, statutory provisions were not "impermissibly vague" and had been "construed in a manner providing adequate guidance."

15. Observing that systems allowing *only* consideration of aggravating circumstances are unconstitutional for failure to provide individualized sentencing determinations, the Court stated,

   "A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also *why it should not be imposed.*"

*Jurek*, supra, at 271, 96 S.Ct. at 2956. Accord *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

16. "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing *threat to* society." Article 37.071(b)(2), V.A.C.C.P.

17. See n. 3, *ante*, for recitation of the "deliberateness question," the first special issue. The third special issue inquires:

   "If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

See *Evans v. State*, 601 S.W.2d 943, 946 (Tex.Cr. App.1980) [wherein third punishment issue was construed "to permit the jury to consider particularized mitigating circumstances"].

tence of death." *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976). Because of the qualitative difference between death and other punishments, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson,* supra, at 305, 96 S.Ct. at 2991.

It has come to this Court's attention from numerous and diverse sources that the term "deliberately" as employed in the first special punishment issue in our statutory capital murder scheme has created a great deal of confusion, calling into question the reliability of jury findings made thereon. See n. 8, *ante,* and accompanying text. It is now unreasonable to assume that jurors will be able to determine the issue reliably without further assistance when legal scholars and members of the bench and bar have debated the subject continuously for more than seven years.[18] The meaning of the word "deliberately" is now settled; thus, assistance to the jury is available. Accordingly, we should now employ that power reserved to us by the Supreme Court in *Jurek,*[19] supra, and hold that upon timely request by a capital murder defendant or the State, that party is entitled to have the jury instructed at the punishment phase[20] to the effect of the following:

(1) as employed in the first special issue, the word "deliberately" has a meaning different and distinct from the word "intentionally," as that word was previously defined in the charge on guilt, and

(2) instead, as employed in the first special issue, the word "deliberately" means a manner of doing an act characterized by or resulting from careful and thorough consideration; characterized by awareness of the consequences; willful, slow, unhurried, and steady as though allowing time for a decision.[21]

In the instant case though the appellant requested it, the jury was not instructed in any fashion upon the meaning of "deliberately" and how it differs from the meaning of "intentionally." Having determined such an instruction is essential to the reliability of the jury's arbitration of that issue submitted at punishment in capital cases, I would hold it was prejudicial error to deny such guidance in this case.

To the majority's failure to so hold, I dissent.

---

**18.** The majority avoids the critical issue by pretending the word is "easily comprehended by everyone" and therefore "jurors can be fairly presumed to know and apply such meaning," then faulting appellant for making no showing that guidance to the factfinder on this issue is necessary.

I too have pondered the consequences of the holding I suggest and though I find it unpalatable, it is preferable to having even more capital convictions vacated by the federal courts because of grossly uneven applications of our sentencing procedure down the line. Compare, e.g., *Blansett,* supra, with *Wilder,* supra. I would have "the buck stop[ ] here."

**19.** While it is true, as observed in *King,* supra, that the United States Supreme Court did not require that we construe particular words and phrases extant in the special punishment issues,

that Court intimated the necessity to construe certain words might arise, and reserved that construction for this Court. *Jurek,* supra, 428 U.S. at 271, n. 6, 96 S.Ct. at 2956, n. 6.

**20.** Article 36.14, V.A.C.C.P., requires:

"... [I]n each felony case ... the judge *shall,* before the argument begins, *deliver to the jury,* ... a written charge distinctly setting forth *the law applicable to the case;* ...."

See also Article 36.15, V.A.C.C.P., and compare *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App. 1981) (wherein the trial court's failure to give instruction at the capital punishment phase was held not reversible error absent an objection or requested instruction).

**21.** Webster's New Collegiate Dictionary, G. & C. Merriam Co. (1977).