**Steven Todd COOPER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09-90-244 CR.**

Court of Appeals of Texas, Beaumont.

Decided Nov. 25, 1992.

E. Stanley Topek, Houston, for appellant.

Charles R. Mitchell, Dist. Atty., San Augustine, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Murder. Appellant's guilt was determined by a jury. Appellant elected to have the trial court assess punishment. Punishment was assessed by the trial court at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of seventy-five (75) years. Appellant presents this Court with six points of error. We will only address appellant's first two points of error

as our discussion of those points will preclude the need to analyze the remaining four points. Appellant's first two points are presented to us as follows:

> Point of Error No. 1: The trial court committed reversible error by refusing to limit the jury charge definition of the capable (sic) mental state to the results of the offense.

> Point of Error No. 2: The evidence is insufficient to support the verdict.

Although not the basis for our reversal of this case, the sufficiency of the evidence issue must, nevertheless, be addressed. *Selman v. State,* 663 S.W.2d 838, 840 (Tex. Crim.App.1984). As we are considering appellant's first two points of error in inverse order, a detailed recitation of the facts in the light most favorable to the verdict is necessary. *See Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

The record before us reflects that on August 19, 1989, two year old Blake Aaron McMahon suffered an injury to his stomach. At the time the injury to Blake occurred, he was outside of the mobile home in which he lived. The only other person outside and in the vicinity of Blake at the time of the injury was appellant, Todd Cooper. Appellant also lived in the mobile home with Blake and Blake's mother, Ann McMahon Cooper[1], and Blake's younger sister, Ashley.

On August 20, 1989, at approximately 3:00 p.m., appellant and Ann Cooper discovered that Blake had stopped breathing. Appellant attempted CPR on Blake without success. Appellant then carried Blake to appellant's grandmother's house. Appellant's grandmother lived a short distance from the mobile home. It was at appellant's grandmother's house that several people also attempted CPR on Blake prior to the arrival of emergency medical services personnel. At approximately 3:20 p.m., Newton County Sheriff's deputies arrived on the scene and were informed by EMS personnel that Blake was dead. Deputies

---

1. At the time of the events of August 19 & 20, 1989, appellant and Ann McMahon were not married. At the time of trial, September 4, 1990, appellant and Ann McMahon were married.

at the scene talked to appellant and were informed by appellant that Blake had fallen in the back yard the day before and thereafter complained of his stomach hurting. Blake's condition worsened in that he began a bout of vomiting which continued through the remainder of August 19 and into August 20. Appellant told Deputy David Coffman that Blake's fall might have been the cause for the continuous vomiting as Blake's fall "knocked the wind out of the child."

Doctor Oscar Griffin, who performed the autopsy on Blake, testified that an external examination of Blake's body revealed numerous bruises on the left side of the forehead, a bruise on the left shoulder, a bruise on the abdomen with the abdomen "markedly protuberant." Blake also appeared to be obviously dehydrated. An internal examination of the body revealed the abdominal cavity filled with "whole blood." The doctor testified that although Blake had died from suffocating on his own vomit, the nausea and vomiting which preceded the suffocation was caused by a "massive, blunt trauma" to Blake's abdomen that had torn the "Ligament of Treitz." The doctor explained that the Ligament of Treitz was an internal organ consisting of dense fibrous tissue containing many blood vessels. The doctor emphasized that the Ligament of Treitz was a very tough tissue which would require "some great trauma, some great injury" to cause it to rupture. The doctor further testified that the small bruise on Blake's abdomen was in line with the Ligament of Treitz.

When asked his opinion as to the type of instrumentality that could have inflicted the injury to Blake's abdomen, the doctor responded that it would have to be a blunt instrument, not abnormally large, used with a great deal of force. The doctor also responded that a fist could have caused the injury; that the injury was caused by some outside force "human in origin;" but that a two year old boy could not have caused the injury received by himself. When presented with the possible explanation first raised by appellant that Blake's stomach injury occurred from falling on a tree stump, a flat object no more than three-quarters of

an inch high, the doctor responded that Blake's injury could not have been caused in this way. The doctor further stated, "I do not think this was due to any sort of fall. I think some sort of trauma was applied to this child, and I think it was caused by somebody else." The doctor opined that the elapsed time between the injury to Blake's stomach and his death was between 24 to 48 hours.

Blake's mother, Ann McMahon Cooper, was called as a witness by the State in its case-in-chief. Mrs. Cooper testified that as far as she knew Blake had not sustained any other injuries before his death. She also admitted that no one else was with Blake at the time he received the injury to his stomach other than appellant; and later reiterated this fact by stating that no one else was in the area to possibly injure Blake on August 19, 1989 except appellant. Mrs. Cooper also testified that she was with Blake "from the time he was brought in until that next day."

Newton County Sheriff Wayne Powell was called to testify concerning an interview he had with Ann McMahon Cooper immediately after Blake's funeral on August 22, 1989. Sheriff Powell testified that the interview was conducted at the Sheriff's Office. It was at this interview that Mrs. Cooper first learned of the contents of the autopsy report and the doctor's opinion as to Blake's cause of death. The direct examination of Sheriff Powell continued as follows:

Q. (the State) Sheriff, would you state whether or not the subject matter of her having an opinion as to Blake's death came up?

A. (Sheriff Powell) It did. I did ask her about it, what her opinion was concerning the matter before us at the time, and she said, "I think he did it."

Q. And then did she go any further?

A. Yeah. She did have a little more to say about that. I wanted to look at it right here just a minute and make sure exactly what she did say about it. My question to her concerning the matter was: "Since things have happened and

have happened and you have backed off and looked at this—these things in a different light, what is your honest opinion about what happened here?"

And she said: "I think he did it." Saying that she thought that he ...

MR. ADAMS (for appellant): We're going to object to that, Judge, his characterization of what she—he's testified what she said, and we—we would object to any characterization or explanation of it. I think the statement stands by itself.

THE COURT: The objection is sustained.

A. Well, she went on to tell me that he had the baby outside and nobody else was around and he could have done any number of things.

The summary of the evidence set out above is essentially all of the applicable evidence dealing with the events of August 19 & 20, 1989. It is easy to see why both parties readily characterize this case as one hinging on circumstantial evidence.

■ When asked to review evidence sufficiency, either direct or circumstantial, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found each essential element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Matson v. State*, 819 S.W.2d 839 (Tex.Crim.App.1991). In situations where some or all of the State's evidence is circumstantial, such evidence is not tested by a different standard of review than direct evidence, but a conviction based upon circumstantial evidence cannot be sustained if the evidence does not exclude every reasonable hypothesis other than the guilt of the defendant.[2] *Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Crim.App.1992). We are aided in this rather delicate analysis by language taken from *Russell v. State*, 665 S.W.2d 771, 776

(Tex.Crim.App.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984):

In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State, supra; Mills v. State*, 508 S.W.2d 823 (Tex. Cr.App.1974); *Herndon v. State*, 543 S.W.2d 109 (Tex.Cr.App.1976). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and the facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Jones v. State*, 442 S.W.2d 698 (Tex.Cr.App.1969); *Taylor v. State*, 87 Tex.Cr.R. 330, 221 S.W. 611, 615 (Tex. Cr.App.1919); *Flores v. State, supra.*

■ As is quite clear from the various authorities cited above, with regard to circumstantial evidence cases, that any alleged hypothesis must be a reasonable one *and* must be consistent with the circumstances and the facts proved. In the instant case, after a careful review of the evidence, we find no evidence which raised a *reasonable* hypothesis for Blake's death in response to the State's theory that appellant was the culpable individual. Recall that the original explanation provided by both appellant and Mrs. Cooper was that Blake had injured his stomach by falling in the back yard. Whatever degree of reasonableness that this hypothesis may have had when first placed into evidence was virtually extinguished by Dr. Griffin who repeatedly emphasized the fact that a great deal of force would have been necessary to cause a tear in such a "tough tissue" as the Ligament of Treitz. He was just as unequivocal in stating that a two year old boy

---

2. We recognize the fact that the use of the "reasonable hypothesis analytical construct" has been abandoned. *See Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991). However, as the *Geesa* holding is not to be retrospectively applied, appellant's sufficiency point must be decided pursuant to the analytical construct. *Id.*

falling on a slightly raised tree stump would not cause the "massive blunt injury" that Blake sustained.

With regard to any other person being responsible for the infliction of the injury which led to Blake's death, the record is completely silent. The record is also silent as to any other place or time in which Blake's fatal stomach injury could have occurred. The direct testimony of Mrs. Cooper does, however, place Blake in the presence of appellant at the only time when Blake's fatal injury could have occurred. The fact that appellant was alone with Blake when the injury occurred, can be, *in combination with other evidence*, highly probative of guilt. *Tezino v. State*, 765 S.W.2d 482, 485 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd); *Green v. State*, 736 S.W.2d 253, 255 (Tex.App.—Beaumont 1987, no pet.); *Martinez v. State*, 723 S.W.2d 264, 265 (Tex.App.—San Antonio 1986, pet. ref'd).

In the instant case, the State elicited testimony from several witnesses amounting to additional circumstances which, taken along with appellant's presence, could cumulatively support the trier of facts' finding of guilt.

The State elicited testimony from Mrs. Cooper that on June 21, 1989, only two months prior to Blake's death, Mrs. Cooper left Blake and Ashley in the care of appellant while Mrs. Cooper went shopping. When Mrs. Cooper returned to the mobile home, she discovered bruises on Blake as well as injuries to his leg and head. Mrs. Cooper testified that both Blake and appellant related to her that Blake had fallen down some stairs and that Blake had hit his head on the bottom grate during the fall. Mrs. Cooper took Blake to the hospital.

Additional testimony was elicited by the State regarding the June 21st incident from Dorothy Lovett, a caseworker for Child Protective Services, and from Shirley Cottonjin, a registered nurse at the clinic where Mrs. Cooper initially brought Blake for treatment of the injuries allegedly sustained in the fall down the stairs. Ms. Cottonjin testified that she examined Blake on June 21 and that Blake had bruises on his entire body, a lacerated lip, a swollen bump on his head, and human bite marks on his right arm. Ms. Cottonjin further testified that she did not think that all of Blake's bruises could have occurred from just a fall down the stairs because they were scattered in too many places over his entire body. She also recalled that the bite marks looked to be a few days old. Ms. Cottonjin then recalled a statement made by Mrs. Cooper, "She said that he (Blake) seemed to get hurt a lot when she left him with him.... But she kind of said it in a joking manner."

Ms. Cottonjin also described Blake's reaction to appellant's arrival at the clinic on June 21. She described that Blake was hesitant to go to appellant; that Blake grabbed her (Ms. Cottonjin's) lab coat and clung to it and she could not pry him loose; and that Blake hung on to her lab coat when appellant reached for Blake. Ms. Cottonjin testified that, in her opinion, Blake was "very frightened" of appellant. Ms. Cottonjin also testified that she was so alarmed by Blake's injuries that she requested that Child Protective Services be notified. Blake was admitted to the hospital because of the seriousness of his head injury.

Dorothy Lovett was the Child Protective Services caseworker who responded to the call initiated by Ms. Cottonjin. Ms. Lovett interviewed Mrs. Cooper at the hospital on June 21. Ms. Lovett also observed the bruising on Blake's body. Ms. Lovett testified that she too was skeptical that all of Blake's bruises could have been the result of the single fall down the stairs as the bruises were in various stages of healing. Ms. Lovett took some photographs of the bruises on Blake's body. These photographs were introduced into evidence.[3]

Additional circumstances present in the record include comments from Mrs. Cooper with regard to her observations of appellant's treatment of Blake. Sheriff Powell

---

3. The photocopies of these photographs contained in the exhibits volume before us are of such poor quality that the nature and extent of the bruising is not apparent.

testified that he questioned Mrs. Cooper as to any "excessive force" use on Blake by appellant. The Sheriff characterized Mrs. Cooper's response as, "She stated that everytime (sic) she left Todd with the boy by himself that he was always bruised or hurt." Sheriff Powell further elaborated on her answer by stating, "She just said that it seemed like everytime (sic) he was left alone with Todd that he—that, 'I'd come back and he'd be bruised. And he fell in June and that had my suspicion up, and now this, ...'"

The State also elicited the following testimony from Mrs. Cooper:

Q. (the State) Have you ever told your mother that Todd was too rough on the baby, do you remember that?

A. (Mrs. Cooper) I remember saying he was too rough, in my opinion, which I never really got on to my child.

 MR. ADAMS: Your Honor, I think we're getting—getting into acts and character again that I objected to before. I'll make the objection but I'd rather do it outside the presence of the jury.

 THE COURT: Okay. It's overruled.

Q. Well, what did you tell your mother about Todd?

A. I told her I thought he was too rough on him at times.

■ Our *Jackson v. Virginia* standard for reviewing the sufficiency of the evidence naturally encompasses the law in Texas that provides that the jury is the *exclusive* judge of the facts proven, the credibility of the witnesses, and the weight to be given to their testimony. *See* Tex. Code Crim.Proc.Ann. art. 38.04 (Vernon 1979); *Sharp v. State*, 707 S.W.2d 611 (Tex.Crim.App.1986), *cert. denied*, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). In the instant case, an instruction to that effect was included in the trial court's charge to the jury. Furthermore, the law fully provides that a jury may believe a witness even though the witness's testimony has been contradicted, and that a jury may accept any part of a witness's testimony and reject the rest. *Sharp, supra* at 614; *Jackson v. State*, 505 S.W.2d 916 (Tex.Crim.App.1974).

A short but highly instructive rule-of-thumb on the scope of appellate review with regard to evidentiary sufficiency is provided in *Moreno, supra*, 755 S.W.2d at 867:

> The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign or weigh evidence. This the factfinder has already done. The factfinder, best positioned to consider all the evidence first-hand, viewing the valuable and significant demeanor and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by ... the evidence, with such evidence being viewed under the *Jackson* light. Concrete application of the *Jackson* standard is made by resolving inconsistencies in the testimony in favor of the verdict. (footnote omitted)

In the instant case, the application portion of the trial court's instructions to the jury contained two alternate theories of Murder, the pertinent portions appearing as follows:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 19th day of August, 1989, in Newton County, Texas, as alleged in the indictment, the defendant, STEVEN TODD COOPER, did then and there intentionally, with intent to cause serious bodily injury to an individual, BLAKE AARON McMAHON commit an act clearly dangerous to human life, to-wit: hit and cause to be hit the said BLAKE AARON McMAHON in the abdomen with defendant's fist or an instrument unknown to the Grand Jury, thereby causing the death of said BLAKE AARON McMAHON, ...

OR

> if you find from the evidence beyond a reasonable doubt that on or about the 19th day of August, 1989, in Newton County, Texas, the defendant, STEVEN

TODD COOPER, did then and there intentionally or knowingly or recklessly commit or attempt to commit a felony, to-wit: injury to a child, BLAKE AARON McMAHON, and in the course of and in furtherance of the commission or attempt, STEVEN TODD COOPER intentionally or knowingly or recklessly committed or attempted to commit an act clearly dangerous to human life that caused the death of BLAKE AARON McMAHON, to-wit: hit and cause to be hit the said BLAKE AARON McMAHON in the abdomen with defendant's fist or an instrument unknown to the Grand Jury, thereby causing the death of said BLAKE AARON McMAHON, ... you will find the defendant, STEVEN TODD COOPER, guilty of the offense of murder.

■ In the instant case, the jury returned a general verdict finding appellant "guilty of the offense of murder as charged in the indictment." Where there is a general verdict returned by the jury and evidence is sufficient to support said verdict under any theory of the crime submitted to the jury, the verdict will be applied to the theory finding support in the facts. *See Aguirre v. State*, 732 S.W.2d 320, 326 (Tex.Crim.App.1987) (opinion on rehearing). We find that under either theory of Murder submitted to the jury, a rational trier of fact could have found each essential element proven beyond a reasonable doubt.

While recognizing that the only direct evidence implicating appellant in the August 19 injury to Blake was that appellant was in the presence of Blake and had the opportunity to injure Blake as no one else was around, we feel that the additional "other evidence" dealing with prior incidents of suspicious injuries sustained by Blake while under appellant's care coupled with the fact that no other *reasonable* hypothesis was raised by the evidence would permit a rational trier of fact to find the appellant guilty of Murder based upon the trial court's instructions. All witnesses were vigorously and competently examined and cross-examined. Any bias or prejudice on the part of the witnesses was exposed, especially with regard to Mrs. Cooper, who, the jury learned early in her testimony, had formally married appellant on September 22, 1989, a little over one month after Blake's death. We overrule, therefore, appellant's second point of error, finding the evidence sufficient to support the conviction.

■ Turning now to appellant's first point of error, complaint is made of the trial court's refusal, over appellant's objection, to restrict any language dealing with appellant's culpable mental state to the "result" of his conduct. The trial court's instructions to the jury contained abstract explanations dealing with intentional, knowing, and reckless acts.[4] The two theories of Murder submitted to the jury in the application portion of the jury instructions were taken from Tex.Penal Code Ann. secs. 19.02(a)(2) & 19.02(a)(3) (Vernon 1989). Section 19.02(a)(3) is also known as the "felony murder" provision.

As we appreciate it, case law makes it very clear that Murder under sec. 19.-02(a)(2) is a "result" type of crime. *Lugo–Lugo v. State*, 650 S.W.2d 72, 81 (Tex.Crim. App.1983). This was determined by analyzing sec. 19.02(a)(2) in light of certain provisions contained in Chapter 6 of the Penal

---

4. "A person acts intentionally, or with intent, with respect to the *nature of his conduct* or to a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.

"A person acts knowingly, or with knowledge, with respect to the *nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

"A person acts recklessly or is reckless with respect to *circumstances surrounding his conduct* or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the *circumstances exist* or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the standpoint of the person charged." (emphasis ours)

Code which is entitled, "Culpability Generally," and concluding that the mental state criminalized in sec. 19.02(a)(2) was that state of mind which contemplated the prohibited *result*, i.e., death of an individual, and not the conduct or nature of the conduct that caused death. *Id.* at 81–82.

■ With regard to sec. 19.02(a)(3), the State posits in its brief that "the other way murder was alleged and charged to the jury herein, by sec. 19.02(a)(3) involved a conduct oriented homicide with a result oriented underlying felony." The State is correct in characterizing the underlying felony in its "felony murder" allegation, injury to a child, as result oriented. *See Haggins v. State*, 785 S.W.2d 827, 828 (Tex.Crim.App. 1990); *Alvarado v. State*, 704 S.W.2d 36 (Tex.Crim.App.1985); *Beggs v. State*, 597 S.W.2d 375, 377 (Tex.Crim.App.1980). The State, however, is incorrect in characterizing sec. 19.02(a)(3) as a "conduct oriented" homicide. In felony murder cases, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act. *Rodriquez v. State*, 548 S.W.2d 26, 28–29 (Tex.Crim.App. 1977); *Mackey v. State*, 811 S.W.2d 643, 645 (Tex.App.—Waco 1991, pet. ref'd).

We hold, therefore, that the trial court erred in instructing the jury with the full content of the language set forth in TEX.PENAL CODE ANN. sec. 6.03(a), (b), and (c) (Vernon 1974) in the face of appellant's request to limit said language to result only. *Haggins, supra* 785 S.W.2d at 828; *Banks v. State*, 819 S.W.2d 676, 679 (Tex. App.—San Antonio 1991, pet. ref'd); *Tissier v. State*, 792 S.W.2d 120, 123 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd).

■ A complaint by an appellant that a trial court's instructions to the jury were erroneous must be reviewed, first to determine whether the charge was indeed erroneous, and second, to decide whether the error, if any, caused sufficient harm to appellant as to require a reversal of the conviction. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985). If the error has been properly preserved at trial, any harm, regardless of the degree, is sufficient to require reversal. *Gibson v. State*, 726 S.W.2d 129, 133 (Tex.Crim.App.1987) (opinion on rehearing).[5] In the instant case, appellant properly preserved the issue at trial.

■ In the instant case, the record reflects that during the *voir dire* portion of the trial, the State made the following observations to the *venire:*

Now, what I think is an important point, and I will—I will bring that up several times during my questioning you, the point being we are not going to attempt to show that he intended to kill this baby. We're going to attempt and we think we can show that he either intended to cause serious bodily injury or he was in the course of committing another felony, that being injury to a child, and he did an act clearly dangerous to human life that caused his death.

Now, injury to a child is the felony that we maintain he was in the course of committing at the time. To commit injury to a child, the law allows us to show, and the law requires us to show—well, let me first say that injury to a child is what's call a result-oriented crime—no, I'm sorry, it's a conduct-oriented crime rather than a result-oriented crime. You intended to cause the conduct, not necessarily you intended to cause the result. And you can commit injury to a child either knowingly, intentionally or recklessly. We maintain that that's an important part of it when we're talking about children, and that will be defined to you also.

**5.** The State's brief totally omits any mention of *Almanza* and instead relies on *Holley v. State*, 766 S.W.2d 254 (Tex.Crim.App.1989) with regard to "considering alleged charging error." The State's reliance on *Holley* is misplaced. Although dealing with alleged charging error in a murder case with underlying allegations of injury to a child, the issues raised by the *Holley* appellant are clearly distinguishable from that raised by the instant appellant. Furthermore, the Court of Criminal Appeals in *Holley* was addressing the first *Almanza* prong of considering the charge as a whole to discover whether the charge was erroneous. The *Holley* Court found the charge not to be erroneous. *Almanza's* "any harm" issue was never reached.

Basically, a child is 14 years of age or under, has not reached its 15th birthday. No question here; the child further fits that definition there because the child hadn't reached its third birthday. You can commit murder of a child and—and—commit murder of a child by acting recklessly. You don't have to act knowingly; you don't have to act intentionally, and you only have to act, the conduct, and not the result.

During jury argument, the State reminded the jury of the remarks made during *voir dire* with the following:

> During *voir dire* we went over very carefully, I did, I know, and I think maybe perhaps Mr. Adams mentioned it also, when a child is involved murder can be accomplished by demonstrating reckless conduct. Now, I'm not saying, admitting or conceding to the fact that all we can show is reckless. All I'm saying is that's all we have to show. None of y'all indicated any disagreement with that, any problem with that being the law, and I assume that's still the case now.[6]

Because of the State's emphasis on its need to prove merely that appellant "intended to cause the conduct," and its express denial for the need to prove that any of the culpable mental states were tied to the result of the offenses, we find some harm to appellant from the erroneous jury instructions. Point of error one is sustained. The judgment of the trial court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

6. The record of appellant's *voir dire* portion indicates that appellant's trial counsel did not discuss with the *venire* the issue of "conduct" versus "result" oriented crimes.