COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|                       |   |                         |
|-----------------------|---|-------------------------|
| JOSHUA WENSEL,        | § | No. 08-10-00051-CR      |
|                       | § |                         |
| Appellant,            | § | Appeal from the         |
|                       | § |                         |
| v.                    | § | 346th Judicial District Court |
|                       | § |                         |
|                       | § | of El Paso County, Texas |
| THE STATE OF TEXAS,   | § |                         |
|                       | § | (TC# 20070D01655)       |
| Appellee.             | § |                         |

## **O P I N I O N**

Joshua Wensel was convicted of injury to a child with serious bodily injury and was sentenced to 22 years' in prison. On appeal, he argues that the evidence was insufficient to support his conviction. We affirm.

Both Wensel and his wife, Candice Kendikian, were charged in connection with the death of Kendikian's son, eighteen-month-old Malachi Torrance. *See generally State v. Kendikian*, No. 08-08-00182-CR, 2009 WL 2709923 (Tex.App.--El Paso Aug. 28, 2009, pet. dism'd)(not designated for publication). Wensel was charged with murder and with injury to a child. Regarding injury to a child, the indictment specifically alleged that Wensel "intentionally and knowingly by omission, cause[d] serious bodily injury to Malachi . . . by then and there failing to provide care, protection and control . . . ."

On the day Malachi died, the El Paso Fire Department received a 9-1-1 call, reporting a fallen baby, at 10:41 a.m. At 10:54 a.m., Antonio Hernandez and John Hilverding, of the El Paso Fire Department, arrived at the apartment shared by Wensel, Kendikian, and their children. They

testified that Malachi was lying on a bed, wearing a diaper. Both officers described Malachi as "lifeless." He had no pulse and his body was "covered in bruises" in various stages of healing, including "significant" bruises on his head, shoulder, and upper torso. In the words of Hernandez, Malachi had "the look of death on him." Wensel was "shaking and panicking and crying." He told the officers that Malachi fell and hit his head. But in assessing Malachi's condition, Hernandez found nothing to indicate that he had fallen and hit his head. His injuries were not consistent with that claim. Hilverding agreed that Malachi's injuries were not consistent with Wensel's story. Both officers said that Malachi's body was cool, which was not normal. Malachi did not respond to medical treatment at the scene and was transported to a hospital at 11:06 a.m. He was pronounced dead at 11:30 a.m.

Christopher Paul Fitzpatrick had known Wensel since the two were teenagers. He visited with Wensel and the children often when Malachi was one-year old. Describing Malachi's development at that time, Fitzpatrick stated, "[F]or a one-year-old, you would expect him to start talking or walking, you know. He wasn't up to par with -- I would say that he wasn't up on his skills, I would say, for a one-year-old." Fitzpatrick testified that although Wensel demonstrated "more love" for his biological son, he treated Malachi as if he were his own. Fitzpatrick did not feel that there was a problem between Wensel and Malachi. But he also testified that Malachi had "quite a few bruises." Wensel told him that the bruises were caused by an iron deficiency. Fitzpatrick also described an incident in which he peeked through a doorway and saw Wensel treating Malachi in a "rough" manner.

Wensel's grandmother and mother stated that Malachi was a late walker, was slow and clumsy, and sustained bruises from falling. But when shown pictures of the bruising on

Malachi's body on the day he died, they indicated that they had never seen bruises like that before and that these were not the type of bruises that occurred when he fell. Although Malachi lived with Wensel's mother for a few months, she was not aware that he had an iron deficiency and she testified that he did not seem to be low on iron.

Wensel's grandmother additionally testified that she was with Wensel starting sometime between 8:30 and 9 on the morning Malachi died. She took Wensel to run some errands and then took him home. She went in the apartment with Wensel, but did not see or hear the children. About ten or fifteen minutes after she left, Kendikian called her to say that Malachi was not breathing.

Malachi lived with his grandmother (the mother of his biological father) from the time he was seven months old to nine months old. She testified that he did not bruise easily. He was "a happy camper" who ate well and had no medical problems. He weighed 25 pounds at the age of nine months. According to the autopsy report, he was this same weight at the time of his death nine months later. This made him below average for his age--between the thirtieth and fortieth percentile range on a growth chart.

The medical examiner presented the autopsy report and testified regarding his findings. Malachi had a healed fracture in the posterior portion of one of his ribs, swelling of the brain, and at least 45 bruises of different ages. Fractures in the posterior portion of a rib are considered "nonaccidental" because "[i]t's very unusual for a child to break a rib in the back by falling or by some kind of squeezing. It generally comes from a blunt impact to that area, maybe an automobile accident or maybe being kicked." The brain swelling could also have been caused by a blunt impact. The medical examiner stated that the number of bruises on Malachi "would be

hard to explain by just falling." He ruled out the possibility that Malachi bruised easily or had low iron.

Malachi had also experienced a blunt force trauma to his abdomen, causing injury to his pancreas. The pancreas "had started to break down, dissolve, most likely because it had been traumatized." Nearby, the mesentery, which is the fine layer of tissue that keeps the intestine close to the abdominal wall, contained blood, reflecting a very recent trauma. These injuries were not consistent with what would happen if Malachi had fallen over his crib. In fact, nothing in the autopsy was consistent with that version of events.

The medical examiner testified that Malachi died due to shock from blunt-force trauma. The swelling of the brain, combined with the "loss of blood into the soft tissues, the presence of blood in the mesentery, and the changes . . . in the pancreas" may have caused his organs to shut down. The prosecutor asked the medical examiner whether the autopsy findings were "consistent with someone who is beating a child and striking him about the body with something, and the body just gives out, based on the past abuse?" The medical examiner answered, "Yes. I mean, the body went into shock, and the person died."

Although the medical examiner listed the cause of death as multiple blunt force injuries, some of his findings were consistent with drowning. For example, the swelling of the brain could have been caused by decreased oxygen flow, which occurs with drowning. Moreover, Malachi's post mortem body temperature was lower than would be expected based on the time that Malachi purportedly fell and was rendered unconscious. The temperature suggested a three-to-five-hour interval "and/or an episode of body cooling (such as submersion)." These findings made the medical examiner suspect that Malachi may have drowned. In his experience, parents

sometimes put a child who is unresponsive in water in an attempt to revive the child. To test this theory, he opened Malachi's sphenoid sinus during the autopsy and found fluid. The medical examiner stated in the autopsy report that the presence of the fluid "suggests that a component of death 'could' have been submersion (in water), but since there is no definitive test for drowning this remains only a finding." Some other signs of drowning were not present.

During cross-examination, the medical examiner admitted that he could not say exactly which injury caused Malachi's death, nor could he state the exact time of death. A small body loses temperature faster than a large body, an unclothed body loses temperature faster than a clothed one, and putting water on a body would have "a significant effect" on cooling the body. Further, some of Malachi's bruises could have been caused by falling or "roughhousing."

On the day of Malachi's death, Wensel gave two formal statements at the police station, both of which were recorded on DVD. In the first formal statement, Wensel claimed that after his grandmother left, he went to the bathroom and heard his biological son playing with Malachi. As he came out of the bathroom, he saw Malachi leaning over the railing of his crib. Wensel was unable to catch him before he fell. Malachi landed on his head without making a sound; he did not cry at all. When Wensel picked him up, his body was limp.

After receiving the preliminary autopsy results, the detective who had taken the first statement felt that the autopsy raised some questions that needed to be addressed by Wensel. Wensel then admitted that he had left out some information in his first statement and he agreed to give a second statement. Wensel said that he did not actually see Malachi fall out of the crib, but he found him on the floor. Malachi was "moaning" and "wasn't really himself." Wensel picked him up, took his diaper off, sat him up in the bathtub, and turned on the cold water in an attempt

to revive him. Just then, his biological son came in and asked for juice. Wensel went to the kitchen, got the juice, and started getting out food and utensils to make breakfast. He had left the water running and the drain closed. He returned to the bathroom in about two minutes and saw Malachi lying on his side in the water. Wensel took him out of the tub, put him on a bed, and attempted CPR. Wensel did not wrap Malachi in a towel or dry him off. He put Malachi's diaper back on before the paramedics arrived so they would not see his genital area or wonder why he was not wearing any clothes. Both of the paramedics testified that Malachi was dry when they arrived.

Wensel's friends and family testified in his defense. They stated that Wensel was the primary caretaker of the children, that he was a loving father, and that he never mistreated the children. By contrast, Kendikian spent most of her time sleeping and she got frustrated with the children easily. They also testified that after Malachi died, Kendikian seemed calm and unconcerned, while Wensel was very emotional.

The jury acquitted Wensel of murder, but convicted him of injury to a child with serious bodily injury.

In reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010). We must defer to the jury's credibility and weight-of-the-evidence determinations. *Brooks*, 323 S.W.3d at 899. "[I]t is not necessary that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and

-6-

cumulative force of all the incriminating circumstances." *Livingston v. State*, 739 S.W.2d 311, 330 (Tex.Crim.App. 1987); *see Dorsey v. State*, 940 S.W.2d 169, 174 (Tex.App.--Dallas 1996, pet. ref'd).

In this case, the State was required to prove that Wensel intentionally or knowingly, by omission, caused serious bodily injury to Malachi. *See* TEX.PEN.CODE ANN. § 22.04(a)(1)(West 2011). Injury to a child by omission is a "result of conduct" offense. *Williams v. State*, 294 S.W.3d 674, 684 (Tex.App.--Houston [1st Dist.] 2009, pet. ref'd). Accordingly, our focus is on the result of the conduct and not the possible combinations of conduct that caused that result. *See Jefferson v. State*, 189 S.W.3d 305, 312 (Tex.Crim.App. 2006). Because the injury to a child statute does not specify the nature of the conduct, the conduct or omission is inconsequential as long as it was voluntary and done (or not done) with the requisite mental state to effect the result the Legislature has specified. *See Alvarado v. State*, 704 S.W.2d 36, 39 (Tex.Crim.App. 1985).

Wensel argues that the evidence is insufficient to establish that he had the requisite mental state. The evidence is sufficient if it establishes that Wensel's omissions were made either with the conscious objective or desire to cause serious bodily injury to Malachi or with an awareness that serious bodily injury was reasonably certain to result. *See Johnston v. State*, 150 S.W.3d 630, 635-36 & n.2 (Tex.App.--Austin 2004, no pet.); *see also* TEX.PEN.CODE ANN. § 6.03(a),(b)(West 2011). Intent or knowledge may be inferred from the acts, words, and conduct of the accused and from the nature of the victim's injuries. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002).

We first note that "inconsistent statements[] and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara v. State*, 152

S.W.3d 45, 50 (Tex.Crim.App. 2004). There is a bounty of evidence from which the jury could have found that Wensel lied to the first responders and to the police about the circumstances leading up to Malachi's death. His claim that Malachi fell out of the crib is inconsistent with Malachi's injuries. Further, the evidence suggests that Wensel may have claimed that he placed Malachi in the bathtub because he had been advised that the medical examiner had indicated that Malachi may have drowned. The jury might have also rejected the bathtub story based on the fact that Malachi was not wet when the first responders arrived or based on the implausibility of some of the details of that story. *See Tezino v. State*, 765 S.W.2d 482, 485 (Tex.App.--Houston [1st Dist.] 1988, pet. ref'd)(holding that jury could consider inherent implausibility of appellant's description as to how child was injured). Lying demonstrates consciousness of guilt. *See Amador v. State*, 275 S.W.3d 872, 879 (Tex.Crim.App. 2009). Any conduct on the part of the accused, subsequent to commission of the crime, that indicates a consciousness of guilt may be considered as circumstantial evidence and may actually be one of the strongest indicators of guilt. *Lee v. State*, 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref'd).

The evidence demonstrates that Malachi was a healthy baby until he went to live with Wensel and Kendikian. Once Malachi was in their home, Wensel, his principal caregiver, failed to provide him with sufficient nourishment. There was evidence that Malachi had been physically abused for several months, dating back to when Fitzpatrick noticed bruises on his body. The jury could have inferred that Wensel was the abuser because Fitzpatrick saw Wensel treat Malachi roughly, he was the principal caregiver, and he falsely claimed that Malachi had an iron deficiency to conceal his conduct.

The evidence suggests that Malachi received a final beating in the hours before the 9-1-1

call. Kendikian spent most of her time sleeping, and Wensel indicated that she was asleep when Malachi fell. Thus, the evidence suggests that Wensel administered the last blows. *See Cooper v. State*, 842 S.W.2d 414, 418 (Tex.App.--Beaumont 1992, pet. ref'd)(evidence that appellant was alone with child when fatal injury occurred and that he had lied about the cause of previous injuries was highly probative of guilt). At that point, the medical examiner's testimony suggests that Malachi's body was damaged from previous abuse and from lack of nourishment. As the person responsible for caring for Malachi, the person who had physically abused him for months, and the person who inflicted the final blows, Wensel was in a unique position to understand the seriousness of Malachi's condition. However, based on the evidence that Malachi's body was cool when the first responders arrived and that his post mortem body temperature indicated that he had been dead for several hours, the jury could have inferred that Wensel, the only conscious adult in the apartment, did not attempt to secure immediate medical treatment for Malachi, but waited until he was already "lifeless." From all this evidence, the jury could have rationally found that Wensel failed to secure timely medical help for Malachi with the conscious objective or desire to cause him serious bodily injury or with an awareness that serious bodily injury was reasonably certain to result. *See Johnston*, 150 S.W.3d at 636-37 (holding that evidence that child appeared to be very sick for several days but appellant did not take him to hospital for fear abuse would be discovered was sufficient to establish intent or knowledge); *cf. Tezino*, 765 S.W.2d at 485 (holding that failure to render aid known to be needed supported an inference that injuries were intentionally inflicted).

Wensel also argues that the evidence is insufficient to establish causation. He compares this case with *Dusek v. State*, 978 S.W.2d 129 (Tex.App.--Austin 1998, pet. ref'd). In *Dusek*, the

appellant's boyfriend broke her child's leg. 978 S.W.2d at 131. The court held that the evidence was insufficient to establish that the child suffered a serious bodily injury because of an omission by the appellant. *Id.* at 133. There was no evidence that the appellant delayed in seeking medical treatment for the child or that any omission on her part aggravated the seriousness of the injury. *Id.*

As described above, there is evidence in this case that Wensel delayed in seeking medical care. There is also evidence that Malachi had been abused over a period of months. The medical examiner testified that he had bruises that were from two-to-five days old. The autopsy findings indicated that Malachi's death was attributable to the cumulative effect of a period of abuse, culminating with a blunt-force trauma that was "just one too many." Yet Wensel could not remember the last time that Malachi had been to a doctor. He could only identify one time that Malachi had ever been to the doctor, and that was to get "his shots." Wensel did not seek medical treatment for any of Malachi's injuries until he was near death. The jury could have rationally concluded that Wensel's failure to obtain timely medical care caused Malachi serious bodily injury.

Wensel's sole issue is overruled, and the judgment of the trial court is affirmed.

September 30, 2011

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)