

# NUMBER 13-06-00563-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**MARIE A. REILLY,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 226th District Court
### of Bexar County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

A jury found appellant, Marie A. Reilly, guilty of murder and sentenced her to twenty years' imprisonment. *See* TEX. PENAL CODE ANN. §§ 19.02, 12.32 (Vernon 2003). By two issues, Reilly challenges the legal and factual sufficiency of the evidence supporting her conviction. We affirm.

## I. BACKGROUND

On the morning of Monday, April 17, 1989, the San Antonio Police Department received a call regarding the murder of Jayne Hays, a seventy-five-year-old retiree. When police arrived at Jayne's apartment, they discovered Jayne's bloody body laying face-up on the kitchen floor; a pillow covered her face and there were flowers in the kitchen trash can. The apartment was in order except for the master bedroom. In the master bedroom the window was open; the screen to the window was on top of some bushes outside of the bedroom. The dresser, which sat below the window, was away from the wall, and the dresser had a shoe print on top of it. Investigators searched the apartment for fingerprints. They also identified DNA on several items, including a Buddha statue, which was found in the living room, and a kitchen rag. However, no suspect was immediately charged.

In 2003, the cold-case homicide division reopened the case. In 2005, Reilly, Jayne's former cleaning lady, was indicted on a single count of murder. The indictment alleged that Reilly caused Jayne's death by striking her with a statue and an unknown object. Reilly, who was born in 1928, pleaded not guilty to the indictment; the case was tried to a jury. Forensic experts, police officers, Jayne's family and neighbors, Reilly, and Reilly's acquaintances testified at trial.

### A.      Forensic Evidence

Vincent Dimaio, M.D., the chief medical examiner for Bexar County, testified about the autopsy report that his office prepared. According to the report, Jayne sustained fifteen wounds shortly before her death, which included:  defensive wounds on her forearms, a broken nose, a depressed skull fracture, and numerous lacerations to her head and face.

2

Dimaio testified that the lacerations were caused by a linear object and that the depressed skull fracture was caused by a different object. He opined that a sixty-year-old woman, such as Reilly, was capable of causing the wounds. Dimaio also opined that Jayne might have known the murderer because a pillow was placed over her face, and a murderer who knows the victim sometimes covers the victim's face because the murderer does not want to see what was done.

Erin Reat, a forensic scientist, testified about the results of genetic tests that he conducted on the Buddha statue, a kitchen rag, and other items found in Jayne's apartment. Reat compared genetic material found on those items to Jayne's and Rielly's DNA. According to the test results, the kitchen rag tested positive for blood and also tested positive for Jayne's and Reilly's DNA. Reat could not, however, specify whether the DNA came from the blood on the rag or other sources. The test results also showed that there were some "genetic markers which were foreign to both [Jayne and Reilly] on a swabbing from the Buddha statue."

## B.    Law Enforcement Testimony

Jimmy Porter, a detective in the evidence unit when Jayne was murdered, helped process the crime scene by drawing a diagram of Jayne's apartment. He testified that a brass clock and a Buddha statue both had blood on them and were found in the living room. Detective Porter testified that police officers had "mixed feelings" about whether the apartment had been burglarized. Some evidence technicians felt that the apartment had been burglarized, but others felt that it was made to look like a burglary.

George Saidler, a police officer in the cold-case division, testified about his investigation. Officer Saidler reviewed the case file and spoke to Detective Ernest Tavitas,

3

who was the detective-in-charge of the case in 1989. Detective Tavitas had interviewed Reilly and provided Officer Saidler with a tape recording of his interview. Officer Saidler determined that Reilly had been a main suspect in the case from the beginning of the investigation. He located Reilly's whereabouts and, with the help of other police officers, obtained a DNA sample from Reilly.

Alvin Brown II, a detective at the time of the murder, testified that Detective Tavitas assigned him to locate Reilly and obtain her fingerprints and a photograph of her. On April 20, 1989, Detective Brown reviewed the case file and staked-out Reilly's home. When Reilly left her home in a car, Detective Brown followed her, witnessed her make a traffic violation, and called for a uniformed police officer to initiate a traffic stop. During the traffic stop, Detective Brown approached Reilly and she told him, "I didn't kill her." Reilly also told him that:

> She—she indicated to me that she was—people had said she was a suspect but she said she wasn't, she hadn't done it. And at that time, I noticed that she had her finger on her right hand, I think it was her middle finger, was bandaged and had a splint on it and I asked her what had happened. And she indicated that she had slammed it in a car door and then she produced a handwritten note from—I think that name was Keller, a Ms. Keller, that supposedly said that she had witnessed the Defendant slam her finger in the car door. And I obviously thought that was really strange.
>
> She told me that she had been treated at Brooke Army Medical Center for the injuries and she last saw the complainant on April the 12th and there was no problem between the two of them.

Detective Brown further testified that Reilly recalled taking flowers to Jayne a few days before the murder.

## C.    Keller's Testimony

4

Paulette Keller, a teacher, testified that Reilly was her cleaning lady around the same time that Jayne was murdered. Keller further testified that on Sunday, April 16, 1989, Reilly called between 9:00 p.m. and 10:00 p.m. to advise her that she had taken soup to Keller's house, but that she hurt her finger on the car door and had not dropped off the soup. Reilly went to clean Keller's house the next day but she could not clean everything because of her injured finger. On Thursday of that week, Reilly called Keller at 6:30 in the morning, asking for a note explaining that she had injured her finger on Sunday. Keller refused to provide Reilly with a note because she did not witness Reilly injure her finger.

### D. Scott's, Pamela's, and Laird's Testimony

Scott Hays, Jayne's son, testified that Reilly was his mother's cleaning lady but that Jayne had fired her. Shortly after the firing, Jayne received a letter threatening a defamation lawsuit from an attorney who represented Reilly. The letter states:

> I have been retained by Marie Reilly to consider filing a defamation of character lawsuit against you. Marie Reilly has related to me that she believes you have unjustly accused her of stealing a sum of money from your house.
>
> Ms. Reilly feels deeply hurt by this accusation, and quite naturally feels very bitter because she is convinced that it is unjust. Additionally, Marie Reilly has worked for, and does work for some of the most prominent members of the San Antonio community in the capacity of a domestic, and prides herself upon an excellent reputation.
>
> Please know that in the event false accusations continue to be made against Marie Reilly to other persons, Ms. Reilly has instructed this office to immediately file a lawsuit for defamation.

Scott opined that once Jayne fired Reilly, she would not have rehired her because "once

[Jayne] did something, it's set in stone."

Pamela Hays, Jayne's daughter-in-law at the time of the murder, testified that Jayne told her that she fired Reilly because she suspected that Reilly pried open a lockbox and stole $800. Jayne confronted Reilly about the missing money, but Reilly denied the accusation. Pamela further testified that on April 16, 1989, she visited Jayne, left her young daughter with Jayne, and went to the grocery store to buy Jayne groceries. When Pamela returned, Jayne seemed scared and told Pamela that she had changed the locks. Pamela also testified that:

> [Jayne] didn't tell me the exact day, but she told me that a few days before I had been there, that Marie had come over and that she had like—I don't think she used the word pushed, but she came into her apartment and she was demanding to see her letter. She wanted to go make a copy of it, the letter that was sent from the attorney's office, and she also wanted to see the lockbox. And Jayne said that she refused to let her take the letter, said it wasn't going to leave her apartment, and she said she wasn't going to show her the lockbox.

Catherine Laird, Jayne's apartment manager, testified that everyone at the apartment complex was friendly, that everyone got along, and that there had never been a burglary at the complex. She testified that, on the Thursday before the murder, Jayne called her and requested a lock change. The next morning, Tony Cruz, the apartment maintenance man, changed the locks on Jayne's apartment. On Monday, April 17, Laird received a phone call from one of Jayne's neighbors who was concerned because she had not seen Jayne. Laird then went to Jayne's apartment, and she asked Cruz to inspect it. Cruz discovered Jayne's body, and the police were called.

## E.    Defense Witnesses

Reilly called two of Jayne's neighbors to testify about Jayne's interactions with an

unidentified man at the apartment complex shortly before the murder. Helen Vacek testified that she saw Jayne arguing with a homeless man by the apartment's dumpster. Janice Hollingsworth testified that on April 16, 1989, she also saw Jayne arguing with a homeless man near her apartment.

Reilly testified that she did not murder Jayne and that she was not physically capable of murdering Jayne because of an automobile accident she had in 1988. She testified that she hurt her finger while taking some soup to Keller. During cross-examination, Reilly testified that she had visited Jayne on the Friday before the murder to take her to a doctor's appointment. When Reilly arrived, Jayne told her that she had already been to the doctor, but she asked Reilly to clean the apartment. Reilly obliged and cleaned Jayne's apartment. While Reilly was cleaning, she testified that she cut her finger on the blinds and used a kitchen rag to stop the bleeding. When asked by the State to explain why she had never mentioned cutting her finger at Jayne's apartment during the initial investigation in 1989, Reilly responded, "I don't recognize, I don't think so."

Cindy Baltimore, Reilly's daughter, testified that she and Reilly had been involved in an automobile accident on April 4, 1984, and Reilly was injured in the accident because she was not wearing her seatbelt. Baltimore also testified that Reilly returned home complaining about a hurt finger on Sunday, April 16, 1989.

The jury convicted Reilly of murder in the first degree and sentenced her to twenty years' imprisonment. This appeal followed.

## II. STANDARDS OF REVIEW

By two issues, Reilly contends that the evidence is legally and factually insufficient

to support her conviction. In a legal sufficiency review, we consider the entire trial record to determine whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found the accused guilty of all essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). In conducting our review of the legal sufficiency of the evidence, we do not reevaluate the weight and credibility of the evidence, but ensure only that the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993). In circumstantial evidence cases, it is unnecessary for every fact to point directly and independently to appellant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) (citing *Russell v. State*, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983)).

When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 416 (Tex. Crim. App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that

conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

"Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). "The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Id.* The jury may choose to believe some testimony and disbelieve other testimony. *Id.* at 707.

### III. Discussion

A person commits murder if the person (1) intends to cause serious bodily injury and (2) commits an act clearly dangerous to human life that (3) causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(2). Here, the State alleged that Reilly struck and killed Jayne with a statue and an unknown object. In challenging the factual sufficiency of the evidence, Reilly argues that the only way the jury could convict her was through speculation. We disagree.

The Texas Court of Criminal Appeals has explained that juries are "permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007).

9

In this case, the inferences that the jury made to conclude that Reilly murdered Jayne are reasonable and supported by the evidence. Pamela testified, without objection, that Jayne fired Reilly for stealing. Reilly's attorney sent Jayne a letter threatening a defamation lawsuit if she did not stop alleging that Reilly stole from her. Pamela further testified that Jayne seemed scared only a few days before her murder because Reilly had visited and wanted to see the letter and the lockbox. Laird testified that Jayne changed the locks on her apartment around the same time that Reilly had visited Jayne. Dimaio testified that a murderer who knows the victim sometimes covers the victim's face because the murderer does not want to see what was done. Jayne was found with a pillow over her face. Reilly injured her finger at approximately the same time that Jayne was murdered, and she telephoned Keller at 6:30 in the morning with a request for a letter to explain the injury. And finally, during a traffic stop, Detective Brown approached Reilly, and she volunteered, "I didn't kill her."

It is clear that Jayne fired Reilly because she suspected that Reilly was stealing from her. The jury could have reasonably inferred that Jayne thought Reilly was dangerous because Pamela testified that Reilly scared Jayne on one occasion. Additionally, the jury could have reasonably inferred that Reilly injured herself during the murder and sought an alibi from Keller. Thus, the record contains some evidence of motive and means. Reilly's first issue, which challenges the legal sufficiency of the evidence supporting her conviction, is overruled.

By her second issue, Reilly challenges the factual sufficiency of the evidence by arguing that the jury convicted her because of inconsistencies in her testimony, which can

10

be explained by her age. She does not cite, however, any authority for this argument. *See* TEX. R. APP. P. 38.1(i) (providing that the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities). In any event, we defer to the jury's assessment of a witness's credibility. *Lancon*, 253 S.W.3d at 705. Evaluating the evidence in a neutral light, favoring neither party, we cannot say that the guilty verdict is clearly wrong and manifestly unjust, or that the evidence in support of the judgment is outweighed by the great weight and preponderance of the contrary evidence. *See Watson*, 204 S.W.3d at 414-15.

## IV. CONCLUSION

The judgment of the trial court is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish. TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 13th day of November, 2008.