

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00034-CR

BOBBY RAY TURNER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 16F0481-102

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Following a bench trial, Bobby Ray Turner was found guilty of burglary of a habitation and sentenced to twenty years' confinement in prison.[1] Turner appeals his conviction arguing that the evidence was legally insufficient to prove beyond a reasonable doubt that he committed burglary of a habitation. We overrule Turner's sole point of error because we find that legally sufficient evidence supports his conviction. Accordingly, we affirm the trial court's judgment.

## I.    Background

On the morning of May 24, 2016, Sean Reynolds had been working in his yard when he decided to drive to the corner gas station. According to Reynolds, he was away from his home for approximately ten minutes. When Reynolds arrived back home, he saw that a vehicle had backed up to his garage, and there were two men there, one holding his leaf blower. Reynolds stated, "My garage door was open, and they appeared to be basically robbing the place." Reynolds did not recognize the vehicle nor did he recognize the two men standing near his garage. Reynolds described one of the men as being a white male with a tattoo on his neck and the other as a black male, a "smaller fellow." The black male was later determined to be Turner.[2]

According to Reynolds, both men were "up inside the edge of the garage." Reynolds explained that, when he pulled closer, he tried to block the men with his vehicle in an effort to prevent them from leaving. Reynolds then exited his vehicle and proceeded to confront the two men, inquiring as to why they were on his property. Reynolds stated that he was very close to

---

[1]The charge against Turner was enhanced with one prior felony conviction.

[2]We will refer to the white male as Allison.

Allison, but that Turner "got in the vehicle basically as soon as [Reynolds] pulled up . . . ." Reynolds immediately contacted 9-1-1, at which point Allison began begging Reynolds not to report the incident, explaining that he had been given "permission to come get this stuff, and it was a mistake." At that point, Reynolds went inside his home for a brief moment, but when he returned outside, the two men were gone.

According to Reynolds, Allison and Turner stopped "down towards the end of [his] driveway, kind of turned sideways." Allison then drove back toward Reynolds, exited the vehicle, and began walking toward him. Reynolds stated that he instructed Allison to "stop coming towards [him]." Despite Reynolds' instructions, Allison continued walking toward him, explaining that he was already on probation and that the whole situation was a mistake.

Allison then got back into his vehicle, drove down the road, turned around toward Reynolds, "hollering out the window, trying to, you know, not get me to call the police." According to Reynolds, he had asked Allison and Turner to stay there until the police arrived, but they chose not to do so. Reynolds said that Allison and Turner were in a "greenish, grayish, bluish color" Chevrolet truck and that he had been able to take a photograph of the vehicle.[3] Reynolds stated that he did not exchange words with Turner. "[Turner] just sat" in the passenger's seat of the vehicle. Reynolds testified that, in addition to the leaf blower[4] that had been removed from the garage, he was also missing a DVD case, a tool bag, a DeWalt drill, some drill bits, random

---

[3]Reynolds also took photographs of the garage door of his home, which were offered and admitted into evidence. Reynolds explained that the garage door was closed when he left his home that morning and that he believed force had been used to gain entry into it.

[4]The record shows that Allison was the individual holding the leaf blower.

hand tools, and "a few other just odds and ends." According to Reynolds, neither Allison nor Turner had consent to be on his property or in his garage.

Nicholas Moses, a deputy for the Bowie County Sheriff's Office, responded to a call from dispatch in which he was given Allison's and Turner's description, along with a description of the truck they were in. Shortly after receiving the call from dispatch, Moses located the truck less than five minutes away from Reynold's home. The truck was parked just below an electrical high-line and in between two heavily wooded areas. Moses stated that Allison was standing on the passenger's side near the rear of the truck. Allison informed Moses that Turner "had run into the woods."[5] According to Moses, the truck contained bolt cutters, pliers, a tool box, a gas can, a DeWalt drill, a metal pry bar, two hammers, and a saw. Moses explained that the types of items found in the truck were commonly used to commit residential burglaries.[6] Allison was subsequently placed under arrest for burglary of a habitation.

Moses stated that, after Allison was taken into custody, he searched the immediate area "to make sure [Turner] had not hid in the wood line, while [he] was walking through . . . ." During his search, Moses found a yellow and black zippered tool bag in the wood line.[7] According to Moses, the tool bag had been found in the grass of the tree line on the driver's side of the vehicle.

---

[5]Allison gave Moses a description of Turner and a description of what he had been wearing. In turn, Moses radioed dispatch with the information.

[6]On cross-examination, Moses acknowledged that the tools found in Allison's truck were also commonly used for ordinary tasks, such as carpentry and construction work.

[7]Moses explained that, when he arrived there, Allison was standing on the passenger side of the vehicle; however, according to Reynolds, Allison had been the individual driving the vehicle when Turner and Allison left Reynolds' home. Moses explained that Allison had switched sides since leaving Reynolds' house.

4

The items contained in the bag were later determined to have been items belonging to Reynolds and taken from his garage.

In addition, Moses stated that, when he initially approached Allison, he asked Allison where his "partner" was. Allison responded that he did not know and did not know why Turner fled because they had done nothing wrong. Allison also told Moses that there had simply been a misunderstanding. Moses stated that, "as far as [he knew]," none of the items found in the vehicle belonged to Turner. When Moses was asked if there existed any physical evidence in the form of fingerprints or DNA that would tie Turner to the stolen items, Moses said there was not.[8] Following a search, Turner was located in the area several hours later.

Turner testified that, on the morning of May 24, 2016, he found his car's windshield "busted" and that he was planning on taking his car to the repair shop as soon as it opened. Turner stated that he had asked Allison to take him to get something to eat and, in return, Turner agreed to give Allison money for gasoline and pay for Allison's meal. Turner stated, "So, we left there and went to get something to eat, went by his house, and then I put him some gas in the truck. At this time, [Allison] was dozing off, and which is how I ended up behind the wheel of the truck."

According to Turner, before they left the gasoline station, Allison told him "that he need[ed] to go somewhere and borrow something from a friend." "Something to do with the lawn,

---

[8]Robbie McCarver, a supervisor for the Criminal Investigation Division of the Bowie County Sheriff's Office, also testified at trial. McCarver stated that, following Turner's arrest, Turner agreed to participate in an interview. During the interview, Turner stated that Allison had told him that Allison had gotten permission to borrow a leaf blower and that they were going to Reynolds' home to retrieve it. McCarver stated that he believed the vehicle belonged to Allison, but that Turner drove Allison's vehicle to Reynolds' house and Allison drove the vehicle away from the residence. McCarver was asked whether, after speaking with Turner, he had been persuaded by Turner's version of events, to which McCarver responded, "I saw nothing from his statement that would clear him of involvement in the burglary."

you know." Turner said that Allison directed him toward Reynolds' home and then said, "[T]urn in right there and back in." When Turner was asked what business he had at Reynolds' home, he responded, "I didn't have any business there. I was just riding with him, and the only reason why I was behind the wheel of that truck is because he was dozing off on the way to the gas station to get the gas."

According to Turner, he was not paying attention to Allison, and he did not see him open the garage door of Reynolds' home. Turner said that he was drinking bottled water and texting on his cell phone. Turner explained that he heard a noise that sounded like Allison was raising the garage door, but that he did not see him enter the garage. Turner did, however, see Allison bring tools back to the truck, adding, "Like I said, I didn't know at this time that he was committing no crime, because I'm thinking that he's had permission to borrow whatever he's brung [sic] to the truck or whatever."

Turner stated that he did not go near the garage door, did not touch the garage door, and did not "step foot" inside the garage. He also said he did not touch any of the items from Reynolds' garage, did not remove any of the items from the garage, and did not assist Turner in loading the items into the truck. Turner claimed that it was not until Reynolds and Allison began speaking to one another that it "crossed [Turner's] mind" that Allison was "stealing this man's property probably." When asked if he was in the driver's seat of the truck at the time Reynolds was speaking to Allison, Turner stated, "I went to the passenger seat. Now, I did -- I did get out. I did get out and walk around to the passenger side of the truck."

According to Turner, he had not discussed with Allison the prospect of burglarizing Reynolds' home, and he did not discuss or plan to break into any person's home with Allison. Turner said he was neither a "lookout" for Allison nor the "get-away driver." He continued, "We never had a conversation about stealing anything. I'm not a thief." Turner stated that, when police officers located him, there were no stolen items found on his person.

## II. Standard of Review

In evaluating legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the trial court's judgment to determine whether any rational fact-finder could have found the essential elements of the charged offense. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When faced with conflicting evidence, we presume that the trial court resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

## III. Discussion

A person commits the offense of burglary if, without the effective consent of the owner, the person "enters a habitation, or a building (or any portion of a building) not then open to the

public, with intent to commit a felony, theft, or an assault." TEX. PENAL CODE ANN. § 30.02 (West Supp. 2017).  In its amended indictment against Turner, the State alleged that, on or about May 24, 2016, Turner,

> did then and there, with intent to commit theft, enter a habitation, without the effective consent of <u>Sean Reynolds</u>, the owner thereof.
>
> **Paragraph Two:**  and it is further presented in and to said court that the said <u>Bobby Ray Turner Jr., aka Bobby Ray Turner aka Bobby Collins aka Bobby Compton</u>, heretofore on or about <u>May 24, 2016</u>, did then and there intentionally or knowingly enter a habitation without the effective consent of <u>Sean Reynolds</u>, the owner thereof, and attempted to commit or committed theft of property, to wit:  <u>leaf blower, drill bits, DVD's and tool bag</u>, owned by <u>Sean Reynolds</u>.
>
> **REPEAT OFFENDER**
> And it is further presented in and to said Court that, before the commission of the aforesaid offense (hereinafter styled the primary offense), on <u>October 15, 1996</u>, in cause number <u>0582393D</u> in <u>372nd District Court</u> of <u>Tarrant County</u>, Texas, the defendant was convicted of the felony offense of <u>Robbery</u>.

Turner contends that "the trial court misapplied the law of parties by failing to hold the State to the required burden of proof and engaged in speculation as to the meaning of facts, in order to draw conclusions as to . . . Turner's guilt."

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011).  "Evidence is sufficient to convict under law of the parties if the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement." *Rosillo v. State*, 953 S.W.2d 808, 814 (Tex. App.— Corpus Christ 1997, pet. ref'd) (citing *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g)).  "The agreement, if any, must be before or contemporaneous with the

8

criminal event." *Beier v. State*, 687 S.W.2d 2, 3–4 (Tex. Crim. App. 1985) (citing *Urtado v. State*, 605 S.W.2d 907, 912 (Tex. Crim. App. [Panel Op.] 1980)). "While an agreement of the parties to act together in a common design seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act." *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd). Thus, circumstantial evidence may be sufficient to show that a person is a party to the offense. *Beardsley v. State*, 739 S.W.2d 681, 684 (Tex. Crim. App. 1987). When "determining whether an individual is a party to an offense and bears criminal responsibility, the court may look to events before, during, and after the commission of the offense."[9] *Id*. "Furthermore, a person can be convicted as a party even if the indictment does not explicitly charge him as a party." *Powell*, 194 S.W.3d at 506 (citing *Marable v. State*, 85 S.W.3d 287, 288 (Tex. Crim. App. 2002)).

Citing *Gross v. State*, Turner contends that, absent a showing that Turner and Allison were working together at the time of the offense or that he knew Allison intended to commit burglary, Turner's presence at the crime scene and his flight therefrom were insufficient evidence to support a guilty verdict via the law of parties. *See Gross v. State*, 352 S.W.3d 238 (Tex. App.—Houston [14th Dist.] 2011), *aff'd*, 380 S.W.3d 181 (Tex. Crim. App. 2012). In *Gross*, the defendant was driving his brother-in-law home when the defendant and another driver that he did not know, the

---

[9]The Texas Court of Criminal Appeals has explained,

> The statutory language of Tex. Penal Code § 7.01 is silent on the applicability of the law of parties as it pertains to burglary offenses. However, this Court has held previously that an individual may be guilty of burglary of a habitation even though he does not personally enter the burglarized premises if he is acting together with another in the commission of the offense.

*Powell v. State*, 194 S.W.3d 503, 506–07 (Tex. Crim. App. 2006).

victim, got into a verbal altercation at a red light. *Gross*, 380 S.W.3d at 183. The defendant and the victim both pulled over into the parking lot of a gas station, exited their vehicles, and continued to argue. *Id*. About a minute later, the defendant's brother-in-law exited the defendant's truck carrying a shotgun that had been stored in the truck. *Id*. The victim ran toward the convenience store and the defendant shouted, "No, no," but the defendant's brother-in-law shot and killed the complainant. *Id*. The defendant panicked and fled the scene with his brother-in-law and the shot gun. *Id.* at 183–84. The defendant took his brother-in-law to his grandmother's home. *Id.* The defendant denied involvement in the shooting when he was questioned by the police. *Id*. at 184.

Both the court of appeals and the Texas Court of Criminal Appeals held that the defendant's actions were insufficient to support his conviction for murder under the law of parties. *Id.* at 186, 188–89. The Texas Court of Criminal Appeals noted that the defendant's conduct following the offense, which included driving the getaway car from the scene, was "relevant," but could not "stand alone," stating that "[t]he evidence does not indicate that [Gross] anticipated that [his brother-in-law] would shoot" the victim and that "there is no evidence that [Gross] assisted or encouraged [his brother-in-law] to kill" the victim. *Id*. at 188. The court also held that the notion that the defendant and his brother-in-law decided to kill the victim while driving from the red light to the gas station was based on speculation, not on the evidence presented at trial. *Id*.

In the present case, Reynolds testified that he saw both men "up inside the edge of the garage." Thus, there was direct evidence that Turner was present at the scene of the crime. In addition, there was direct evidence that Turner drove the vehicle to Reynolds' home and then backed the truck up to the home's closed garage door. Moreover, the trial court could have

10

reasonably inferred that, due to Turner's close proximity to Allison, he could have clearly seen Allison use force to enter Reynolds' property. This is so whether Turner was outside of the vehicle, as testified to by Reynolds, or whether he was inside the vehicle, as testified to by Turner.

Likewise, the trial court could have inferred that Turner saw Allison remove the items out of the garage and place them in the truck. Further, there was direct evidence that Turner and Allison fled the scene with Reynold's property in the vehicle, despite Reynold's repeated request that they remain at his residence until the police arrived. Notably, Turner continued to flee even after Allison discontinued his attempt to avoid detention. Moreover, Reynolds' property was found in a bag in an area where Turner had been present.

Lastly, a search of the vehicle that Turner had been driving contained tools that were commonly known to be used to burglarize homes or buildings. Moreover, the DeWalt drill that had been identified by Reynolds as one of the items stolen from his garage was also found in the vehicle.[10] Unlike the facts contained in *Gross*, the evidence in this case demonstrates more than Turner's mere presence at or flight from the scene.

---

[10]Turner maintains there was insufficient evidence to support a guilty verdict because the State did not show, by direct evidence, (1) that Turner and Allison were working together as part of a contemporaneous agreement to commit burglary, (2) that Turner encouraged Allison to commit burglary, (3) the length of time Turner and Allison had known one another, (4) the length of time Turner and Allison had been together the morning of the incident, (5) that Turner had any part in opening the garage door, (6) that the tools found in the truck belonged to Turner, (7) that Turner's fingerprints were found on Reynolds' garage door or inside the garage, (8) that Turner touched or possessed any of the items taken in the burglary, (9) that he appropriated or attempted to appropriate any of the items taken, (10) that he acted with intent to promote the burglary, or (11) that he "encouraged, directed, aided, or attempted to aid" Allison in committing the offense. Turner continues, "As such, the State couldn't show any direct evidence of Mr. Turner's acting as a party to the burglary, which resulted in a reliance on Mr. Turner's limited conduct, in an effort to squeeze out even the tiniest of inferences of his guilt."

There is no requirement that the State prove any specific facts by direct evidence in order for the trial court to find Turner guilty of burglary via the law of parties. The elements of burglary can be proven by circumstantial evidence. *Gilbertson v. State*, 563 S.W.2d 606, 608 (Tex. Crim. App. [Panel Op.] 1978). Moreover, in a circumstantial evidence case, every fact need not point directly and independently to the defendant's guilt; it is enough if the fact-

11

When we consider the direct evidence, along with the substantial amount of circumstantial evidence presented, we find the evidence sufficient to support the trial court's verdict of guilt and overrule Turner's sole point of error.

## IV.  Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:     July 3, 2018
Date Decided:      October 2, 2018

Do Not Publish

---

finder's conclusion is warranted by the cumulative force of all the circumstances. *Russel v. State*, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983).